James E. Cecchi
Lindsey H. Taylor
CARELLA, BYRNE, CECCHI
OLSTEIN, BRODY & AGNELLO
5 Becker Farm Road
Roseland, New Jersey  07068
(973) 994-1700

Jay W. Eisenhofer
Michael Barry
GRANT & EISENHOFER P.A.
1201 N. Market Street
Wilmington, Delaware 19801
(302) 622-7000

Attorneys for Plaintiff

Mark Lebovitch
Brett Middleton
Jeremy Friedman
BERNSTEIN LITOWITZ BERGER
   & GROSSMANN LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| LOUISIANA MUNICIPAL POLICE EMPLOYEES' RETIREMENT SYSTEM, on behalf of itself and all other similarly situated shareholders of Medco Health Solutions, Inc.,<br><br>            Plaintiff,<br><br>            v.<br><br>MEDCO HEALTH SOLUTIONS, INC., HOWARD W. BARKER, JR., JOHN L. CASSIS, MICHAEL GOLDSTEIN, CHARLES M. LILLIS, MYRTLE POTTER, WILLIAM L. ROPER, DAVID B. SNOW, JR., DAVID D. STEVENS, BLENDA J. WILSON, EXPRESS SCRIPTS, INC., and PLATO MERGER SUB, INC.,<br><br>            Defendants. | Civil Action No.<br><br><br><br><br><br><br><br><br>**COMPLAINT and**<br>**DEMAND FOR JURY TRIAL** |

Plaintiff Louisiana Municipal Police Employees' Retirement System ("LAMPERS" or "Plaintiff"), on behalf of itself and all other similarly situated public shareholders of Medco Health Solutions, Inc. (hereafter, "Medco" or "the Company") (the "Class"), by way of

Complaint against Defendants, alleges the following claims against Defendants. The allegations of the Complaint are based on the knowledge of Plaintiff as to itself, and on information and belief, including the investigation of counsel and review of publicly available information as to all other matters.

## INTRODUCTION

1.      Over the past few years, the directors and officers of Medco have come under fire for such things as bribery, the loss of significant contracts and excessive compensation. Despite these missteps, the pharmacy benefits provider remains relatively unscathed and well-positioned for the future. Nonetheless, the members of Medco Board have ostensibly "thrown up their hands" and are now "throwing in the towel." In an effort to either stem the tide of possible liability or to simply escape an increasingly complex and competitive market landscape, the Medco directors have hastily agreed to a sale to rival Express Scripts.

2.      In early 2011, in the wake of a bribery scandal involving California Public Employees' Retirement System ("CalPERS") officials and Medco, CalPERS dropped the Company from the list of potential candidates to administer prescription drug benefits for the fund's members.

3.      Additionally, during the first half of 2011, Medco lost contracts with MemberHealth, LLC ("MemberHealth") and Blue Cross Blue Shield Association ("BCBSA"). However, neither the alleged bribery nor the loss of these contracts has negatively impacted the Company's earnings. In fact, Medco has churned out record revenues in the last two quarters.

4.      Throughout the summer of 2011, the Company engaged in discussions with UnitedHealthcare Group Inc. ("UnitedHealthcare") regarding an $11 billion contract. When it

appeared that Medco was going to lose the contract, the Board hastily orchestrated a sale to competitor Express Scripts.

5.     Significantly, the Board made no legitimate attempt to evaluate the Company's strategic alternatives or contact other logical suitors like Walgreen Company, a pharmacy chain who has expressed interest in combining with a pharmacy benefits manager ever since its chief competitor CVS, merged with benefits manager Caremark in 2007.

6.     On July 21, 2011, the Company announced that the Board agreed to sell the Company to Express Scripts for $28.80 in cash and 0.81 Express Scripts shares for each Medco share, valuing Medco at $71.36 per share (the "Proposed Transaction").   The Proposed Transaction values Medco at approximately $29 billion.

7.     The Proposed Transaction is fraught with antitrust risk as the combined company will control over 31% of the pharmacy benefit management market.   Despite facing possibly fatal regulatory review, the Medco Board failed to negotiate for a reverse termination fee payable by Express Scripts in the event the deal does not receive regulatory approval.   Thus, Medco and its shareholders are not adequately insured for the likely antitrust risk the Proposed Transaction presents.

8.     Not only did the Medco Board race into the arms of Express Scripts without running a real sales process, the Board also took unreasonable steps to ensure consummation of a deal with Express Scripts by agreeing to a myriad of deal protections in the deal's merger agreement (the "Merger Agreement").

9.     Finally, the Board has not been forthcoming to Medco's shareholders in approving the Proposed Transaction.   If a change in control transaction is the best course of

action for the Company because of extreme business developments or prospective liability, then the Board needs to meet its duty of loyalty, care, and candor and admit as much to the Company's shareholders who will vote on the Proposed Transaction.  However the Medco Board has maintained that negotiation of the Proposed Transaction was independent of the Company's failure to renew service contracts.  If the Company's situation was not so dire, the Board's rushed sale to Express Scripts was unreasonable and a breach of its fiduciary duties.

### THE PARTIES

10.     Plaintiff LAMPERS is a Louisiana public retirement system, with its principal place of business in Baton Rouge, Louisiana.  LAMPERS is a shareholder of Medco, and has owned shares of Medco common stock throughout the relevant time period.

11.     Defendant Medco is a Delaware corporation with its principal place of business in Franklin Lakes, New Jersey.  Medco is the nation's third largest pharmacy benefit management company.  It provides clinically-driven pharmacy services designed for private and public employers, health plans, labor unions and government agencies of all sizes, and for individuals served by Medicare Part D Prescription Drug Plans.  The Company operates in two segments: Pharmacy Benefit Management ("PBM") and Specialty Pharmacy.  Medco offers clinically based programs that identify drug waste.  Pharmacy management includes mail-order service, retail pharmacy networks, specialty pharmacy management, call center pharmacies and reimbursement services.  With more than 20,000 employees worldwide and 2010 revenues of $66 billion, Medco ranks 34th on the 2011 Fortune 500 list.  Medco trades on the New York Stock Exchange under the ticker symbol "MHS."  Medco is named solely as a party to the Merger Agreement.

12.     Defendant Howard W. Barker, Jr. ("Barker") has served as a member of the Medco Board since August 2003.  Barker is a member of the Board's Mergers and Acquisitions ("M&A") Committee.

13.     Defendant John L. Cassis ("Cassis") has served as a member of the Medco Board since August 2003.  Cassis is a member of the Board's M&A Committee.

14.     Defendant Michael Goldstein ("Goldstein") has served as a member of the Medco Board since 2003.  Goldstein is a member of the Board's M&A Committee.

15.     Defendant Charles M. Lillis ("Lillis") has served as a member of the Medco Board since January 2005.  Lillis is a member of the Board's M&A Committee.

16.     Defendant Myrtle S. Potter ("Potter") has served as a member of the Medco Board since December 2007.

17.     Defendant William L. Roper ("Roper") has served as a member of the Medco Board since December 2007.

18.     Defendant David B. Snow, Jr. ("Snow") has served as the Company's Chief Executive Officer ("CEO") and as a member of the Medco Board since March 2003.  Snow also served as the Company's President from 2003 to 2006.

19.     Defendant David D. Stevens ("Stevens") has served as a member of the Medco Board since May 2006.  Stevens is also Chairman of the Board's M&A Committee.

20.     Defendant Blenda J. Wilson ("Wilson") has served as a member of the Medco Board since 2003.

21.     The defendants listed in paragraphs 12 through 20 above are collectively referred to herein as the "Individual Defendants."

22.     Defendant Express Scripts a Delaware corporation with its principal place of business in St. Louis, Missouri.  Express Scripts is the nation's second largest pharmacy benefit management company.  Express Scripts' clients include health maintenance organizations, health insurers, third-party administrators, employers, union-sponsored benefit plans, workers' compensation plans and Government health programs.   The company has organized its operations into two business segments based on products and services offered:    Pharmacy Benefit Management and Emerging Markets ("EM").  Express Scripts' revenues are generated from the delivery of prescription drugs through its contracted network of retail pharmacies, home delivery and specialty pharmacy

23.     Defendant Plato Merger Sub, Inc. is a Delaware corporation and wholly owned Subsidiary of Express Scripts created for the purpose of the Proposed Transaction.   Upon information and belief, its principal place of business is St. Louis, Missouri.

24.     Each of the entities collectively referred to herein as "Express Scripts" are named as defendants herein because they are parties to the Merger Agreement and for aiding and abetting the Medco Board's breaches of fiduciary duties.

### JURISDICTION/VENUE

25.     This Court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1332(d) in that this is a class action in which the amount in controversy exceeds the value of $5 million, exclusive of interest and costs, and a member of the putative class is a citizen of a State different than the citizenship of one of the Defendants.

26.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)(2) in that a substantial part of the events or omissions giving rise to the claim occurred in this District.

## SUBSTANTIVE ALLEGATIONS

**I.** **Medco's History**

27.      In 1983, Martin Wygod established Medco Containment Services, Inc. ("Medco Containment") as a holding company to purchase National Pharmacies, a vitamin distributor and small mail-order prescription drug business.  Wygod eliminated the vitamin business and built up the mail-order drug business.

28.      In 1984, mail-order drugs accounted for only two percent of the prescriptions filled in the United States.  Wygod's timing was perfect.  Large corporations were looking for ways to save money on employee drug costs, and mail order was a convenient way to save on long-term prescriptions for the chronically ill patient.  Wygod aggressively sought new clients for his mail-order company and quickly signed up corporate-funded drug benefit plans offered by companies such as Alcoa, General Motors, Georgia-Pacific, and Commonwealth Edison Co.

29.      In 1984, Medco Containment conducted its initial public offering.

30.      In 1985, Medco Containment acquired Paid Prescriptions, a company that provided plan subscribers with a prescription-drug card that allowed them to purchase drugs at 40,000 drugstores, who then billed the plan sponsors.  This acquisition allowed Medco Containment to offer plan participants the ability to fill prescriptions for acute illness at a discount at participating drugstores.  This computer network also allowed Medco Containment to gather information on consumer prescription drug spending and sell that information to the nation's largest health plan sponsors.

31.      By 1993, Medco Containment had more than 1,300 corporate accounts.  Medco Containment also grew from 200 employees serving fewer than four million people in 1985 to

6,000 employees serving close to 30 million people. Within ten years of its founding, Medco Containment controlled 50% of the prescription mail business nationally, and its revenues were consistently growing by an average of 47% per year.

32. In November 1993, Merck & Co. ("Merck") purchased Medco Containment for $6 billion.

33. As a subsidiary of Merck, Medco grew to become the nation's leading pharmacy benefits management company. Medco's revenues increased from $2.2 billion in 1992 to $33 billion in 2002.

34. In 2003, Merck spun-off 100% of the outstanding shares of Medco to Merck shareholders.

35. Medco continued to grow as a stand-alone company. In 2010, Medco recorded revenues of approximately $66 billion.

36. Competition in the field of pharmacy benefits management has increased dramatically over the last decade. Prior to the announcement of the Proposed Transaction, Medco's share of the PBM market had slipped to 14%, leaving Medco behind CVS Caremark (21% market share) and Express Scripts (17% market share).

**II.     CalPERS' Bribery Scandal**

37. In October 2009, the CalPERS retained the law firm of Steptoe & Johnson ("Steptoe") to investigate whether participants and beneficiaries in CalPERS' investment fund had been harmed through the fund's use of placement agents. In March 2011, Steptoe published a 75-page report detailing, among other things, an improper relationship between directors and executives at CalPERS and Medco.

-8-

38.     Specifically, Medco paid Alfred Villalobos ("Villalobos"), a former CalPERS board member, $4 million to help secure an $8 million per year contract to administer the prescription drug benefits for the fund's members.

39.     In early 2004, Medco CEO David Snow, Villalobos, and former CalPERS chief executive, Fred Buenrostro, met at Villalobos' Lake Tahoe estate in early 2004 to discuss the contract.

40.     In 2010, the California Attorney General brought a civil suit against Villalobos and Buenrostro, both of whom pled their Fifth Amendment rights when questioned about their involvement with the affair.

41.     In its most recent annual report, Medco disclosed that in April 2010, the Attorney General requested information from the Company about a former consultant engaged by Medco (*i.e.*, Villalobos).  In February 2011, the Company received a telephonic inquiry from the SEC relating to this former consultant.  A month later, the Company received a subpoena from the SEC seeking documents relating to an ongoing probe pertaining to Villalobos.

42.     Following the release of the Steptoe report, CalPERS dropped the Company from the list of potential candidates to administer prescription drug benefits for the fund's members.

43.     An action has been filed against the Company by California state workers and others who allege that they were forced to pay higher rates for their prescription drugs as a result of alleged bribes and secret meetings between the Company and directors and executives of CalPERS.

44.     While the CalPERS scandal has left a bad taste in Medco shareholders' mouths, it has not damaged shareholder value in any material way.

45.     Moreover, despite the seriousness of the allegations, CEO Snow has not been personally implicated in any legal proceedings. The Proposed Transaction is an attempt by Snow and the Medco Board to pre-empt any such development.

## III.    Other Medco Business Developments

### Medco Loses MemberHealth Contract

46.     During the last year, Medco has lost some significant contracts, but the Company's financial performance has remained remarkably stable.

47.     On January 3, 2011, MemberHealth, LLC ("MemberHealth"), a subsidiary of Universal American, provided the Company with notice that it would be terminating its Medicare Part D prescription benefits management agreement with Medco at the end of 2011. Pursuant to the agreement, Medco provides pharmacy benefit management services to beneficiaries of various Medicare plans that are under contract with the Centers for Medicare and Medicaid Services. The notice of termination followed as a result of CVS-Caremark's acquisition of Universal American's Medicare Part D business.

48.     In the press release announcing the loss of the MemberHealth contract, Medco made clear that "the impact to Medco's 2012 earnings will *not be material* as this business is very heavily weighted toward particularly low-margin dual-eligible business." (Emphasis added).

### Medco Loses Federal Employee Program Contract

49.     On May 27, 2011, Medco announced that the Blue Cross Blue Shield Association planned to transition its mail order and specialty pharmacy benefit coverage for the Federal Employee Program ("FEP") to an alternate provider, effective January 1, 2012.

50.     In the 8-K informing shareholders regarding the loss of the FEP contract, the Company noted that "the expiration of this contract will ***not have any impact*** on Medco's 2011 financial results" (Emphasis added) and that the contract "represents less than ten (10%) percent of the Company's estimated 2011 earnings."  (Emphasis added).

***Company Continues To Report Impressive Financial Results***

51.     Despite losing the MemberHealth and FEP contracts, Medco was far from a sinking ship.

52.     During the first quarter of 2011, Medco reported GAAP diluted EPS of $0.80, up 19.4% compared to the first quarter of 2010.  The Company also reported record net revenues for the first quarter exceeding $17.0 billion.  Medco's  Chairman and CEO David Snow commented:

> "Our ***strong first-quarter earnings performance*** was driven by higher generic prescription volumes at mail, continued growth in our Accredo specialty business, growth in our Medicare PDP, the addition of UBC to our business portfolio, and recently installed new-named business wins — as well as our previously announced share repurchase program. As a result, ***we are improving our 2011 EPS guidance***. ***We achieved record net revenues***, and improved our profitability with lower-priced generics. In fact, despite no contributions from new generics in the quarter, generic volumes at mail increased 9.3 percent. Our recent UBC acquisition continues to fuel substantial incremental growth in our service revenues, which increased 57.5 percent over first-quarter 2010.  While it is still very early in the 2012 selling season, we are pleased with our number of early new-named client wins and renewals. We are confident in our differentiated services and competitive positioning in the marketplace. Our 2011 client retention rate remains at over 99 percent, a result of our focus on superior client service and the value that we consistently deliver through our advanced clinical pharmacy model."  (Emphasis added).

53.     During the second quarter of 2011, the Company saw GAAP diluted EPS and revenues continue to rise.  For the quarter, Medco reported GAAP diluted EPS of $0.85, a 10.4% increase from the second quarter of 2010.  Similarly, the Company's revenues increased to a

record $17.1 billion.  Commenting on the quarterly financial results, Chairman and CEO Snow noted:

> "***Medco's second-quarter results are characterized by strong performance across the enterprise***. We generated record revenues that include a 43.3 percent increase in service revenues driven primarily by UnitedBioSource Corp (UBC) and growth across our portfolio of service offerings. Record specialty operating income, continued strong performance in Medicare, and record generic mail-order volume and generic dispensing rates also contributed to our earnings per share growth this quarter. Importantly, our margin percentage profile is stable and expected to grow in the future." (Emphasis added).

54.     While the loss of the MemberHealth and FEP contracts dented the Company's share price, Medco's results were still favorable and the Board continued to downplay any negative effect on the Company's future.

***Medco Loses UnitedHealthcare Contract***

55.     On July 21, 2011, the same day the Board announced the Proposed Transaction, the Company revealed that it had failed to secure renewal of a contract with UnitedHealthcare worth roughly $11 billion.  In a terse press release, the Company stated that: "after several months of discussions, its pharmacy benefit services agreement with UnitedHealthcare would not be renewed."

56.     In a conference call shortly thereafter, Snow admitted that losing the UnitedHealthcare contract was a factor in agreeing to a deal with Express Scripts, but insisted that the negotiations "were on completely independent tracks and came to their own independent conclusion."  Snow did not, however, explain how the two processes were isolated from each other.

**IV.     The Medco Board Agrees To A Moderate
Premium Deal That Poses Heightened Antitrust Risk**

57.     Instead of exploring all of the Company's strategic alternatives, the Board raced

into the arms of eager acquirer Express Scripts once negotiations over the UnitedHealthcare

contract began to break down.  Despite the size and regulatory implications of the Proposed

Transaction, the deal came together in roughly one month.   The expedited construction of the

deal essentially eliminated the possibility of entertaining interest from other possible strategic

partners or purchasers.

58.     On July 21, 2011, Express Scripts and Medco announced that the companies had

entered into the Merger Agreement whereby Express Scripts would acquire its smaller rival.

Pursuant to the Merger Agreement, Express Scripts will pay $28.80 in cash and 0.81 of an

Express Scripts share for each Medco share, valuing the Company at $71.36 per share.  The

offered consideration represents a 28% premium over Medco's closing share price on July 20,

2011.

59.     David Larsen, an analyst at Leerink Swann & Co. in Boston, estimated that

Express Scripts is paying 9.1 times Medco's 2012 estimated earnings before interest, taxes,

depreciation and amortization ("EBITDA"), excluding the UnitedHealth contract. This is a

significantly lower EBITDA multiple than CVS paid to acquire Caremark in 2007, the most

comparable deal to the Proposed Transaction.

60.     Following consummation of the Proposed Transaction, Express Scripts

shareholders are expected to own approximately 59% of the combined company and Medco

shareholders are expected to own approximately 41%.  Additionally, the board of directors of the

combined company will be expanded to include two current members of the Medco Board.

61.     Whether the Proposed Transaction can actually be consummated is highly uncertain as the deal is fraught with antitrust risk.  The Proposed Transaction seeks to combine the second and third largest pharmacy benefit management companies in the U.S.  The combined company would control over 31% of the market.  Regulators will closely scrutinize the Proposed Transaction and it could take years to ultimately obtain regulatory approval.

62.     The market has expressed serious doubts that the Proposed Transaction will ever obtain antitrust approval.  Despite the $71.36 offer price, Medco's stock traded below $65 in the wake of the deal's announcement.  The Board has been silent on the extent of divestitures that the Company will need to make to even attempt to secure regulatory approval.

63.     The Board did not even secure a reverse termination fee from Express Scripts to protect against Express Scripts abandoning the deal if antitrust approval requires unpalatable divestitures or is simply too drawn out.

64.     Because the Proposed Transaction will be subject to extensive regulatory scrutiny as a horizontal combination in an already consolidated industry, the Medco Board's failure to insulate the Company from a potentially devastating inability to secure antitrust approval amounts to a breach of fiduciary duty.  Not only will the Company have squandered resources pursuing the Proposed Transaction, but it will have also wasted an opportunity to negotiate a more lucrative transaction with far greater deal certainty.

## V.     The Medco Board Agreed To Impermissible Deal Protections

65.     Not only did the Medco Board fail to fully explore the Company's strategic alternatives or genuinely consider a standalone plan before agreeing to the Proposed Transaction,

the Board also took unreasonable steps to ensure consummation of a deal with Express Scripts to the detriment of Medco's shareholders.

66. First, the Medco Board failed to negotiate for a "Go-Shop" provision in the Merger Agreement. In light of the Board's failure to conduct a legitimate pre-signing market check, a "Go-Shop" is the only to ensure that shareholders receive the highest value reasonably available for their shares. While not a perfect substitute for a pre-signing auction, a "Go-Shop" could serve a similar function by allowing the Board to canvas the market to determine whether potential suitors are interested in making a competing bid.

67. Instead of negotiating for a "Go-Shop", the Medco Board agreed to a prohibitive "No Solicitation" clause (the "No-Shop"), further limiting the Board's ability to entertain superior strategic alternatives.

68. The No-Shop provision prevents Medco from even encouraging competing bids for the Company; the antithesis of maximizing shareholder value.

69. The Medco Board also granted Express Scripts a "Matching Right" in the Merger Agreement that provides Express Scripts six business days to revise its proposal or persuade the Medco Board not to change its recommendation on the merger in the face of a proposal from a third party suitor.

70. The Matching Right dissuades interested parties from making an offer for the Company by providing Express Scripts the opportunity to make repeated matching bids to counter any competing offers. Due to the complete absence of any pre-signing market check, no justification exists for the inclusion of the Matching Right and other bid advantages in the Merger Agreement.

-15-

71.     The Medco Board further reduced the possibility of a maximizing shareholder value by agreeing to a punitive **$950 million termination fee** (the "Termination Fee").  The Termination Fee is payable if, among other situations, the Medco Board terminates the Merger Agreement and the Company consummates a transaction with another interested party.  Thus, Termination Fee will be payable by any potential third-party buyer, driving up the cost of the acquisition and potentially transferring money to Express Scripts that otherwise could have been paid to Medco shareholders as additional merger consideration.

72.     The inclusion of the No-Shop, Matching Right and Termination Fee (collectively, the "Deal Protections") serve to deter competing parties from making bids and prevents the Medco Board from properly exercising their fiduciary duties to obtain the best available strategic alternative – and resulting maximum value – for Medco's shareholders.

73.     The Deal Protections are unreasonable barriers to competing offers and substantially increase the likelihood that the Proposed Transaction will be consummated, leaving Medco shareholders with limited opportunity to consider any superior offer.  When viewed together, these provisions cannot be justified as reasonable or proportionate measures to protect Express Scripts' investment in the transaction process.  This is particularly true in light of the fact that Medco negotiated exclusively with Express Scripts.

**VI.     Medco Executives Orchestrate A Lucrative Payday**

74.     While the Medco Board failed to properly account for the heightened antitrust risk associated with the Proposed Transaction, the Company's senior executives were sure to protect the windfall they stand to receive if the deal goes through.

-16-

75.    Medco's five senior most executives will receive a total of $62.8 million in severance payments and accelerated vesting of options and restricted stock units.  The payouts will be as follows:

     a.   David B. Snow, Jr., Chairman and CEO - *$30.6 million*;

     b.   Kenneth O. Klepper, President and Chief Operating Officer - *$11 million*;

     c.   Richard J. Rubino, Senior Vice President, Finance and Chief Financial Officer - *$6.8 million*;

     d.   Thomas M. Moriarty, General Counsel, Secretary and President, Global Pharmaceutical Strategies - *$7.3 million*; and

     e.   Timothy C. Wentworth, Group President, Employer/Key Accounts - *$7.1 million*

76.    To ensure Defendant Snow's lucrative payday, on May 24, 2011, the Board extended his employment agreement to March 31, 2015 from its previous expiration date of March 31, 2012.  As a result of the deal's extreme antitrust risk, there is legitimate concern that the Proposed Transaction will not close prior to original date of expiration of Snow's employment agreement.   The extension of Snow's employment agreement serves no rational business purpose, particularly in light of the Snow's shortcomings as CEO, including his role in the CalPERS bribery scandal and the Company's recent loss of several significant contracts.

77.    Additionally, leading proxy advisory firm Glass Lewis & Co. ("Glass Lewis") graded the Company's pay for performance a "D" in 2010, noting that Snow's compensation and that of other senior executives has not been in line with CEOs of comparable companies.

78.    In sum, Snow's performance at the helm of the Company simply does not warrant this accommodation, and it can only be explained by his desire to ensure his windfall in the event closing of the Proposed Transaction is protracted.

-17-

79.     Finally, the investment banks advising Medco and Express Scripts on the Proposed Transaction will garner an estimated $120 million in combined fees for advising on the second-biggest U.S. acquisition of 2011.  Express Scripts advisers Credit Suisse Group AG  and Citigroup Inc. may earn as much as $55 million if the deal goes through, while Medco's main bankers JPMorgan Chase & Co. and Lazard Ltd.  may get $65 million, according to estimates by Lam Nguyen, vice president at New York-based research firm Freeman & Co. This does not include any fees that might be earned by arranging financing for the deal, Nguyen said

80.     With so much money on the line for the people orchestrating the Proposed Transaction, it is no wonder the parties and their advisors took remarkable steps to reach an agreement and impose extensive deal protections.  Unfortunately, these self-interested steps did little to provide full value for Medco's shareholders or provide protection from regulatory roadblocks.

## CLASS ACTION ALLEGATIONS

81.     Plaintiff brings this action pursuant to Fed.R.Civ.P. 23, individually and on behalf of all other holders of Medco's common stock (except defendants herein and any persons, firm, trust, corporation or other entity related to or affiliated with them and their successors in interest) who are or will be threatened with injury arising from defendants' wrongful actions, as more fully described herein.

82.     This action is properly maintainable as a class action.

83.     The Class is so numerous that joinder of all members is impracticable.  The Company has thousands of shareholders who are scattered throughout the United States.  As of April 15, 2011, there were 399,799,325 shares of Medco's common stock outstanding.

84.    There are questions of law and fact common to the Class including, *inter alia*, whether:

a.    The Individual Defendants breached their fiduciary duties by refusing to extract the highest value possible from Express Scripts in exchange for Medco's shares;

b.    The Individual Defendants are acting in furtherance of their owns  self-interest to the detriment of the Class;

c.    The Individual Defendants breached their fiduciary duties by "locking" up" the Proposed Transaction to the detriment of the Class by approving the No-Shop, Matching Right and Termination Fee without obtaining adequate consideration for Medco shareholders;

d.    Plaintiff and the other members of the Class are being and will continue to be injured by the wrongful conduct alleged herein and, if so, what is the proper remedy and/or measure of damages; and

e.    Plaintiff and the other members of the Class will be damaged irreparably by Defendants' conduct.

85.    Plaintiff is committed to prosecuting the action and has retained competent counsel experienced in litigation of this nature.  Plaintiff's claims are typical of the claims of the other members of the Class, and Plaintiff has the same interests as the other members of the Class.  Plaintiff is an adequate representative of the Class.

86.    The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the

Class, which would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual members of the Class, which would as a practical matter be disjunctive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

87.     Defendants have acted, or refused to act, on grounds generally applicable to, and causing injury to, the Class and, therefore, preliminary and final injunctive relief on behalf of the Class, as a whole, is appropriate.

**COUNT I**
**Breach Of Fiduciary Duty**
**Against The Individual Defendants**

88.     Plaintiff repeats the allegations contained in the foregoing paragraphs as if set forth in full herein.

89.     The Individual Defendants, as Medco directors, owe the Class the utmost fiduciary duties of due care, good faith, candor and loyalty.  By virtue of their positions as directors and/or officers of Medco and/or their exercise of control and ownership over the business and corporate affairs of the Company, the Individual Defendants have, and at all relevant times had, the power to control and influence and did control and influence and cause the Company to engage in the practices complained of herein.  Each Individual Defendant was required to: (a) use their ability to control and manage Medco in a fair, just and equitable manner; (b) act in furtherance of the best interests of Medco and its shareholders and not their own; and (c) fully disclose the material circumstances, procedures, and terms of the Proposed Transaction so that shareholders can make a fully informed decision.

90.     The Individual Defendants failed to fulfill their fiduciary duties by racing into the open arms of Express Scripts without making any legitimate attempt to explore the Company's other strategic alternatives.  The Company had weathered the storm of the CalPERS bribery scandal and the loss of several other significant contracts.  There was no reason to believe that the Company would not have bounced back from the loss of the UnitedHealthcare contract.  In short, the desperation exhibited the Medco Board was unwarranted and a breach of its fiduciary duties.

91.     As a result of the Medco directors' breaches of fiduciary duty in agreeing to the Proposed Transaction, the Class will be harmed by receiving the inferior consideration offered in the Proposed Transaction.

92.     Furthermore, the Deal Protections adopted by the defendants and contained in the Merger Agreement impose an excessive and disproportionate impediment to the Board's ability to entertain any other potentially superior alternative offer.  The Medco Board's agreement to the No-Shop, Matching Right and the Termination Fee constitute a breach of fiduciary duty, especially in light of the Individual Defendants' failure to obtain additional consideration in exchange for these valuable concessions.

93.     Plaintiff and the Class have no adequate remedy at law.

**COUNT II**
**Declaratory Judgment**
**Declaring That Merger Agreement**
**Is Unenforceable Against All Defendants**

94.     Plaintiff repeats the allegations contained in the foregoing paragraphs as if set forth in full herein.

95.     The Merger Agreement unlawfully restricts the Medco Board from exercising its fiduciary duties.

96.     The Merger Agreement fails to adequately protect the interests of Medco shareholders in the event the Proposed Transaction is not consummated as a result of regulatory review or acts of Express Scripts.

97.     Plaintiffs and the members of the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiffs and the Class be fully protected from the immediate and irreparable injury which Defendants' actions threaten to inflict.

98.     As a result of the Defendants' breaches of fiduciary duties, Plaintiffs and the other members of the Class have and will be damaged in that they are prevented from obtaining a fair price for their shares and are at undue risk of injury.

<u>**COUNT III**</u>
**Aiding And Abetting Against**
**Express Scripts And Express Scripts Holding Company**

99.     Plaintiff repeats the allegations contained in the foregoing paragraphs as if set forth in full herein.

100.    Defendants Express Scripts and Express Scripts Holding Company knowingly assisted the Individual Defendants in construction of the Proposed Transaction and the related Merger Agreement and which unlawfully restricts the Medco Board from fully informing itself of all of the Company's strategic alternatives in compliance with its fiduciary duties.

101.   Further, Express Scripts leveraged the Board's unfounded fear of prosecution and/or liability to construct the Proposed Transaction in a manner most favorable to Express Scripts and the Board at the expense of Medco's shareholders.

102.   As a result of this conduct by Express Scripts and Express Scripts Holding Company, Plaintiff and other members of the Class have and will be damaged by being denied the opportunity to obtain the highest price reasonably available for their investment in the Company.

103.   Plaintiff and the Class have no adequate remedy at law.

WHEREFORE, Plaintiff demands judgment as follows:

a.   Preliminarily and permanently enjoining Medco and any of the Medco Board members and any and all other employees, agents, or representatives of the Company and persons acting in concert with any one or more of any of the foregoing, during the pendency of this action, from taking any action to consummate the Proposed Transaction until such time as the Medco Board has fully complied with their fiduciary duties to fully appreciate all of the Company's strategic alternatives;

b.   Finding the Medco Board liable for breaching their fiduciary duties to the Class;

c.   Finding the Deal Protections invalid and unenforceable, or in the alternative, amending the Deal Protections as necessary to ensure a full and fair sale process for the benefit of the Class;

d.   Finding Express Scripts liable for aiding and abetting a breach of fiduciary duty;

-23-

e.    Requiring the Medco Board to fully inform itself of all of the Company's strategic alternatives, and giving full and fair consideration to any alternative offers for the Company;

f.    Requiring the Medco Board and Express Scripts to disclose all material information relating to the Proposed Transaction and the related shareholder approval process;

g.    Awarding the Class compensatory damages, together with pre- and post-judgment interest;

h.    Awarding Plaintiff the costs and disbursements of this action, including attorneys', accountants', and experts' fees; and

i.    Awarding such other and further relief as is just and equitable.

CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.
Attorneys for Plaintiff

By:_____James E. Cecchi_____
        JAMES E. CECCHI

Dated: July 22, 2011

Mark Lebovitch
Brett Middleton                             Jay W. Eisenhofer
Jeremy Friedman                             Michael Barry
BERNSTEIN LITOWITZ BERGER                   GRANT & EISENHOFER P.A.
  & GROSSMANN LLP                           1201 N. Market Street
1285 Avenue of the Americas                 Wilmington, Delaware 19801
New York, NY 10019                          (302) 622-7000
(212) 554-1400

-24-

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury as to all issues so triable.

> CARELLA, BYRNE, CECCHI,
> OLSTEIN, BRODY & AGNELLO, P.C.
> Attorneys for Plaintiff
>
> By:_____James E. Cecchi_____
> JAMES E. CECCHI

Dated: July 22, 2011

Mark Lebovitch
Brett Middleton
Jeremy Friedman
BERNSTEIN LITOWITZ BERGER
   & GROSSMANN LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

Jay W. Eisenhofer
Michael Barry
GRANT & EISENHOFER P.A.
1201 N. Market Street
Wilmington, Delaware 19801
(302) 622-7000