UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| LOUISIANA MUNICIPAL POLICE EMPLOYEES' RETIREMENT SYSTEM, on behalf of itself and all other similarly situated shareholders of Medco Health Solutions, Inc.,<br><br>Plaintiff,<br><br>v.<br><br>MEDCO HEALTH SOLUTIONS, INC., HOWARD W. BARKER, JR., JOHN L. CASSIS, MICHAEL GOLDSTEIN, CHARLES M. LILLIS, MYRTLE POTTER, WILLIAM L. ROPER, DAVID B. SNOW, JR., DAVID D. STEVENS, BLENDA J. WILSON, EXPRESS SCRIPTS, INC., and PLATO MERGER SUB, INC.,<br><br>Defendants. | Civil Action No. 11-4211(DMC) |

**PLAINTIFF'S BRIEF IN SUPPORT OF APPLICATION
FOR EXPEDITED DISCOVERY**

James E. Cecchi
Lindsey H. Taylor
CARELLA, BYRNE, CECCHI
OLSTEIN, BRODY & AGNELLO
5 Becker Farm Road
Roseland, New Jersey  07068
(973) 994-1700

Jay W. Eisenhofer
Michael J. Barry
GRANT & EISENHOFER P.A.
1201 N. Market Street
Wilmington, Delaware 19801
(302) 622-7000

Attorneys for Plaintiffs

Mark Lebovitch
Brett M. Middleton
Jeremy Friedman
BERNSTEIN LITOWITZ BERGER
   & GROSSMANN LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

## **TABLE OF CONTENTS**

                                                                        **Page**

TABLE OF AUTHORITIES ................................................................................................... ii

INTRODUCTION ..................................................................................................................... 1

STATEMENT OF FACTS ........................................................................................................ 2

       A.      Medco Becomes Entangled In The CalPERS Bribery Scandal, Loses Contracts
               And Receives A DOJ Subpoena ............................................................................ 2

       B.      The Board "Throws In The Towel" And Hastily Enters The Proposed
               Transaction ............................................................................................................ 4

       C.      Medco Board Locks Up A Modest Premium Deal With Express Scripts .................... 5

       D.      Medco Executives Orchestrate A Lucrative Payday ........................................ 6

LEGAL ARGUMENT ............................................................................................................... 7

PLAINTIFF IS ENTITLED TO EXPEDITED PROCEEDINGS TO ENJOIN ENFORCEMENT
OF THE TERMINATION FEE ................................................................................................ 7

I.      PLAINTIFFS HAVE A REASONABLE PROBABILITY OF SUCCESS ........................... 8

       A.      Termination Fees Are Tested For Reasonableness Under Unocal ............................... 8

       B.      The $950 Million Termination Fee Here Is Excessive As A Matter Of Law And
               Under The Present Circumstances ..................................................................... 10

II.     MEDCO SHAREHOLDERS FACE IRREPARABLE HARM ABSENT
        INJUNCTIVE RELIEF ................................................................................................. 12

       A.      Plaintiff's Requested Expedited Discovery Is Reasonable In Light Of All
               Surrounding Circumstances ............................................................................... 14

CONCLUSION ........................................................................................................................ 15

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*ACE Ltd. v. Capital ReCorp.*,
 747 A.2d 95 (Del. Ch. 1999)..................................................................................................9

*B.P. Chemicals Ltd., v. Formose Chemical & Fiber Corp.*
 229 F.3d 254 (3d Cir. 2000)..............................................................................................12,13

*Better Packages, Inc. v. Zheng*,
 2006 U.S. Dist. LEXIS 30119 (D.N.J. May 17, 2006) ........................................................7, 8

*In re Del Monte Foods Co. S'holders Litig.*,
 2011 WL 2535256 (Del. Ch. June 27, 2011)........................................................................13

*Entertainment Tech. Corp. v. Walt Disney Imagineering*,
 2003 U.S. Dist. LEXIS 19832 (E.D. Pa. Oct. 2, 2003)...........................................................7

*Fagin v. Gilmartin*,
 432 F.3d 276 (3d Cir. 2005)....................................................................................................8

*Gucci America, Inc. v. Daffy's, Inc.*,
 No. 00-4463, 2000 U.S. Dist. LEXIS 16714 (D.N.J. Nov. 14, 2000) .....................................8

*Kysor Industrial Corp. v. Margaux, Inc.*,
 674 A.2d 889, 897 (Del. Super. 1996) ..................................................................................10

*Louisiana Mun. Police Employees' Ret. Sys. v. Crawford*,
 918 A.2d 1172 (Del. Ch. 2007)....................................................................................9, 10, 11

*National Reprographics, Inc. v. Strom*,
 621 F.Supp.2d 204, 621 F.Supp.2d 204 (D.N.J. 2009).....................................................12, 13

*Omnicare, Inc. v. NCS Healthcare, Inc.*,
 818 A.2d 914 (Del. 2003) ........................................................................................................9

*Paramount Communications Inc.v. QVC Network Inc.,*
 637 A.2d 34 (Del. 1993) ..........................................................................................................9

*Phelps Dodge Corp. v. Cyprus Amax Minerals Co.*,
 C.A. No. 17398, 1999 Del. Ch. LEXIS 202 (Del. Ch. Sep. 27, 1999) ..................................10

*Revlon v. McAndrews & Forbes Holdings, Inc.*,
 506 A.2d 173 (Del. 1986) ......................................................................................................11

*In re Toys R Us S'holder Litig.*,
    877 A.2d 975 (Del. Ch. 2005)......................................................................................10, 11

**OTHER AUTHORITIES**

Fed. R. Civ. P. 26(d) ..........................................................................................................7

## INTRODUCTION

In the aftermath of a bribery scandal and the loss of several significant contracts, the board of directors (the "Board") of Medco Health Solutions, Inc. ("Medco" or the "Company") hastily orchestrated a sale of the Company to rival Express Scripts, Inc. ("Express Scripts") for a moderate, but far from blockbuster, premium (the "Proposed Transaction").

Despite the existence of logical suitors like pharmacy giant Walgreen Company ("Walgreens") and an anticipated lengthy antitrust regulatory review process for any deal with an industry competitor, the Board made no attempt to canvass the market before rushing to agree to the Proposed Transaction. Moreover, the Board locked-up the Proposed Transaction with an array of coercive and preclusive deal lockups that eliminate the possibility of a competing bid emerging post-signing.

Most problematic among the lockups is a **_$950 million_** termination fee (the "Termination Fee") payable in the event Medco terminates the Proposed Transaction to accept a superior proposal. The Termination Fee likely will dissuade any otherwise interested bidder from emerging. And even if one emerged, the payment would effectively transfer almost a billion dollars to Express Scripts that otherwise would have been paid to Medco shareholders as additional merger consideration. Whatever legitimate interests merger partners may have in negotiating termination fees, this case is not the rare situation (if one exists) that could conceivably warrant such an egregious transfer of corporate value.

A corporation belongs to its shareholders. The theoretical basis on which a board of directors has the power to agree to give away shareholder value to a third party through a termination fee is that agreeing to pay such a fee is necessary to compensate a third party bidder whose offer is rejected by the target corporation's shareholders. The crux of deeming any such termination fee valid, however, is that the amount of such termination damages provision has

some bearing on the actual estimated damages arising from violation or termination of the proposed merger agreement. There is literally no chance that Express Scripts has invested a billion dollars in making this merger work, and there is truly no relationship between the billion dollar termination fee and any reasonable estimate of cognizable harm to Express Scripts should the merger be rejected by Medco's shareholders. Rather, the termination fee in this instance serves only to make it less likely that shareholder value is maximized by any topping bid, and to coerce the shareholders to accept the deal on the table rather than hold out for a better deal. The Medco Board and their advisors have crossed the line.

The Medco Board made no effort to shop the Company before rushing into the Proposed Transaction. Thus, instead of imposing a bloated termination fee, the Board should be taking steps to facilitate the emergence of competing bids, not stifling them by agreeing to one of the largest termination fees in history. Expedited proceedings are necessary to obtain a ruling from the Court on the validity of the $950 million Termination Fee and the other deal protections contained in the Proposed Transaction. Once those lockups are eliminated, a true market process for control of Medco can take place. Without expedited proceedings and modifications of the lockups, Medco shareholders have no way of knowing whether the Proposed Transaction represents the best deal available in the marketplace. The Proposed Transaction is the product of Defendants' breaches of fiduciary duty and threatens to deprive the Company's shareholders of their opportunity to receive full and fair value for their shares.

## STATEMENT OF FACTS

### A.  Medco Becomes Entangled In The CalPERS Bribery Scandal, Loses Contracts And Receives A DOJ Subpoena

Medco is a pharmaceutical benefits provider. A material part of its business is managing the pharmaceutical needs of large institutions and health insurance plans. In March 2011, a

report by Steptoe & Johnson LLP, outside counsel to one of the largest health benefits providers in the world, California Public Employees Retirement System's ("CalPERS"), revealed that Medco had paid a former CalPERS board member $4 million to help secure an $8 million per year contract with CalPERS.  Following the disturbing revelation of this apparent act of bribery, (i) CalPERS dropped Medco from the list of potential candidates to administer prescription drug benefits for the fund's members; and (ii) Medco has been subjected to several lawsuits and government investigations relating to these alleged improprieties.  Just before and following disclosure of the CalPERS scandal, Medco lost several significant contracts.  In January 2011, MemberHealth, LLC ("MemberHealth") provided the Company with notice that it would be terminating its Medicare Part D prescription benefits management agreement with Medco at the end of 2011.  On May 27, 2011, Medco announced that the Blue Cross Blue Shield Association planned to transition its mail order and specialty pharmacy benefit coverage for the Federal Employee Program ("FEP") to an alternate provider, effective January 1, 2012.  On July 21, 2011, Medco revealed that UnitedHealthcare had declined to renew a contract worth roughly $11 billion.

Additionally, Medco recently received a subpoena from the United States Department of Justice ("DOJ") requesting documents related to the Company's relationship with drug-maker AstraZeneca PLC.

Despite revelation of the alleged bribery, the loss of the MemberHealth and FEP contracts, and the DOJ subpoena, the Company's financial performance has remained remarkably stable.  In fact, Medco has churned out record revenues during the last two quarters.  However, the burgeoning scandals threaten the continued tenure with the Company of Medco's Chief Executive Officer ("CEO"), and likely a broader swath of its senior management.

### B.  The Board "Throws In The Towel" And Hastily Enters The Proposed Transaction

On July 21, 2011, Express Scripts and Medco announced that the companies had entered into an agreement and plan of merger (the "Merger Agreement") whereby Express Scripts would acquire its smaller rival.

Pursuant to the Merger Agreement, Express Scripts will pay $28.80 in cash and 0.81 of an Express Scripts share for each Medco share, valuing the Company at $71.36 per share. The offered consideration represents a 28% premium over the Company's closing stock price on July 20, 2011, and values Medco at a significantly lower EBITDA multiple than CVS paid to acquire Caremark in 2007, the closest comparable to the instant transaction.

The Proposed Transaction represents the Medco Board's attempt to either stem the tide of potential personal liability relating to the CalPERS bribery scandal or to simply escape an increasingly complex regulatory situation and sensitive market landscape. Despite the size and regulatory complexities of the Proposed Transaction, the deal was thrown together in less than one month.

The Medco Board raced into the arms of eager acquirer Express Scripts without fulfilling their duty to fully evaluate the Company's strategic alternatives or contact other logical suitors. For example, Walgreens is a national pharmacy chain who has expressed interest in combining with a pharmacy benefits manager ever since its chief competitor, CVS, merged with benefits manager Caremark in 2007.

The Proposed Transaction is also fraught with antitrust risk as the combined company will control over 31% of the pharmacy benefit management market. Despite facing possibly fatal regulatory review, the Medco Board failed to negotiate for a reverse termination fee payable by Express Scripts in the event the deal does not receive regulatory approval. Thus, Medco and

4

its shareholders are not adequately insured for the likely antitrust risk the Proposed Transaction presents.

### C. Medco Board Locks Up A Modest Premium Deal With Express Scripts

Despite failing to explore the best ways to create and maximize shareholder value before approving the rushed Express Scripts deal, the Board also took unreasonable (and staggering) steps to ensure consummation of a deal with Express Scripts to the detriment of Medco's shareholders.

The single most coercive mechanism used to lock-up the Proposed Transaction and deter any competing bids is a staggering ***$950 million*** Termination Fee. The Termination Fee must be paid by Medco if, among other situations, the Board terminates the Merger Agreement to accept a superior bid. The Termination Fee drives up the cost of any competing acquisition and, even if someone made a topping bid, effectively transfers $950 million to Express Scripts that otherwise would have been paid to Medco shareholders as additional merger consideration.

The nearly one billion dollar Termination Fee is unjustifiable by any measure. A termination fee is supposed to serve merely as compensation for an acquirer's investment in pursuing a deal. It is inconceivable that Express Scripts will incur transaction costs related to the Proposed Transaction anywhere close to $950 million.

To be sure, as if the $950 million preclusive Termination Fee is not enough for Express Scripts, the Medco Board separately agreed to a standalone expense reimbursement fee of up to $100 million. Thus, the termination fee does not even serve to compensate Express Scripts for any out-of-pocket troubles. To the contrary, this bloated break-up fee has one purpose – eliminate the prospect of competing bids.

The Board also agreed to cease all solicitation of offers for the Company despite the fact that the Board hastily orchestrated the Proposed Transaction in less than a month and failed to

conduct a legitimate pre-signing market check or contact other potential bidders such as Walgreens.

Additionally, the Medco Board granted Express Scripts a preclusive "Matching Right" in the Merger Agreement that provides Express Scripts six business days to revise its proposal or persuade the Medco Board not to change its recommendation on the merger in the face of a proposal from a third-party suitor. The Matching Right dissuades interested parties from making an offer for the Company by providing Express Scripts the opportunity to make repeated matching bids to counter any competing offers. In other words, by telling Express Scripts up front that it can have six days to compete with any intervening bid and then match it or top it by one penny, the Medco Board effectively dissuades competitors who may otherwise emerge.

In light of the rushed sales process, no justification exists for the inclusion of the Termination Fee, Matching Right and the other deal protections included in the Merger Agreement.

### D.     Medco Executives Orchestrate A Lucrative Payday

While the Medco Board failed to properly account for the heightened antitrust risk associated with the Proposed Transaction, the Company's senior executives were sure to protect the windfall they stand to receive if the deal with Express Scripts is consummated. At closing, Medco's five most senior executives will receive *a total of $62.8 million in severance payments and accelerated vesting of options and restricted stock units*.

To ensure Medco CEO David Snow's ("Snow") lucrative payday, on May 24, 2011, the Board extended his employment agreement to March 31, 2015, from its previous expiration date of March 31, 2012. As a result of the deal's extreme antitrust risk, there is legitimate concern that the Proposed Transaction will not close prior to original date of expiration of Snow's employment agreement. The extension of Snow's employment agreement serves no rational

6

business purpose, particularly in light of the Snow's shortcomings as CEO, including his role in the CalPERS bribery scandal and the Company's recent loss of several significant contracts.

## LEGAL ARGUMENT

### PLAINTIFF IS ENTITLED TO EXPEDITED PROCEEDINGS TO ENJOIN ENFORCEMENT OF THE TERMINATION FEE

Expedited proceedings are necessary to enable this Court to consider the anticompetitive impact of the $950 million Termination Fee in the proposed merger agreement with Express Scripts with sufficient time to enable other potential suitors for Medco to formulate alternative and financially superior proposals free of the punitive and anticompetitive impact of that excessive fee. In the absence of expedited proceedings, Express Scripts and the Medco Board will be able to solidify the Proposed Transaction through seeking regulatory approval while discouraging other bidders from emerging. Medco's public shareholders, therefore, will forever be deprived of the ability to receive full value for their shares in any proposed sale of the Company.

Federal Rule of Civil Procedure 26 provides the courts with very broad discretion in the management of the discovery process, and as such, the moratorium on discovery prior to the parties' Rule 26(f) conference may be lifted by court order. *See* Fed. R. Civ. P. 26(d). Courts in the Third Circuit expressly permit expedited discovery upon satisfaction of the "reasonableness standard," which requires the Court to examine the reasonableness of the discovery requests in light of all of the surrounding circumstances. *See, e.g.*, *Better Packages, Inc. v. Zheng*, 2006 U.S. Dist. LEXIS 30119 (D.N.J. May 17, 2006); *Entm't Tech. Corp. v. Walt Disney Imagineering*, 2003 U.S. Dist. LEXIS 19832 (E.D. Pa. Oct. 2, 2003).

Application of the reasonableness standard requires consideration of factors such as "a pending preliminary injunction hearing, the need for the discovery and the breadth of the

7

requests." *Better Packages*, 2006 U.S. Dist. LEXIS 30119, at *8. In fact, "expedited discovery is particularly appropriate when a plaintiff seeks injunctive relief because of the expedited nature of injunctive proceedings." *Id.* at *8-9 (internal quotations omitted). "Expedited discovery has been ordered where it would 'better enable the Court to judge the parties' interests and respective chances for success on the merits' at a preliminary injunction hearing." *Id.* at *9 (internal quotations omitted). Where narrowly tailored to fit the needs of a preliminary injunction hearing, leave to conduct expedited discovery should be granted. *Id.* (citing *Entm't Tech., Corp.*, 2003 U.S. Dist. LEXIS 19832).[1]

## I.     PLAINTIFFS HAVE A REASONABLE PROBABILITY OF SUCCESS

### A.     Termination Fees Are Tested For Reasonableness Under *Unocal*

Medco is a Delaware corporation, and as such Delaware law applies in evaluating the conduct of Medco's Board of Directors in entering into the Proposed Transaction with Express Scripts. *See*, *e.g.*, *Fagin v. Gilmartin*, 432 F.3d 276, 282 (3d Cir. 2005). In this regard, the Medco Board's decision to accept a $950 million Termination Fee in the deal with Express Scripts is evaluated under *Unocal v. Mesa Petroleum Co.*, 493 A.2d 946 (Del. 1985), which

---

[1] At least one court in this District has previously used the standard from *Notaro v. Koch*, 95 F.R.D. 403, 405 (S.D.N.Y. 1982), which requires plaintiffs seeking expedited discovery to demonstrate: (1) irreparable injury, (2) some probability of success on the merits, (3) some connection between the expedited discovery and the avoidance of the irreparable injury, and (4) some evidence that the injury that will result without expedited discovery looms greater than the injury that the defendant will suffer if the expedited relief is granted. *See, e.g., Gucci America, Inc. v. Daffy's, Inc.*, No. 00-4463, 2000 U.S. Dist. LEXIS 16714 (D. N.J. Nov. 14, 2000). However, as noted by the Court in *Better Packages*, *Notaro* is not controlling authority and is only applicable when the nonmoving party needs protection from extraordinary discovery requests at an early stage of the litigation. *Better Packages*, 2006 U.S. Dist. LEXIS 30119, at *11 (rejecting the *Notaro* test in favor of the "considerably more liberal" reasonableness standard). The *Better Packages* Court noted that *Notaro* was applied in the *Gucci* case only because disclosure of the information Gucci sought through expedited discovery would have greatly harmed defendant's interests and given Gucci the information it ultimately desired through litigation. *Gucci*, 2000 U.S. Dist. LEXIS 16714. Therefore, the heightened standard was only appropriate because of Gucci's highly questionable motives. *Id.* Additionally, neither *Notaro* nor *Gucci* involved a pending preliminary injunction hearing, as in this case. Plaintiff respectfully submits, however, that the circumstances in this case warrant expedited discovery even if the court utilized the *Notaro* legal standard.

requires that the defensive measures designed to lock up the Proposed Transaction be reasonable as compared to a perceived threat. *See Omnicare, Inc. v. NCS Healthcare, Inc.*, 818 A.2d 914, 931 (Del. 2003) (holding that deal protection provisions such as termination fees "must withstand enhanced judicial scrutiny under the *Unocal* standard of review.") This analysis involves a review of the "reasonableness of the substantive merits of the board's actions." *Id.* at 931, quoting *Paramount Commc'ns Inc.v. QVC Network Inc.,* 637 A.2d 34, 45 (Del. 1993).

Termination fees in merger agreements must be examined to ensure that they are not "preclusive or coercive." *Id.* at 932. If the provisions are not preclusive or coercive, the board still must demonstrate that it has reasonable grounds to believe that a danger to the corporation and its stockholders exists if the merger transaction is not consummated. *See id*. "[A]ny defensive devices must be proportionate to the perceived threat to the corporation and its stockholders if the merger transaction is not consummated." *Id.* Furthermore, no merger provision may define or limit the directors' fiduciary duties to their shareholders under Delaware law. *See Paramount Commc'ns, Inc. v. QVC Network Inc.*, 637 A.2d 34, 55 (Del. 1994) ("To the extent that [a merger agreement] purports to require a board to act or not act in such a fashion as to limit the exercise of fiduciary duties, it is invalid and unenforceable."); *ACE Ltd. v. Capital ReCorp.*, 747 A.2d 95, 105 (Del. Ch. 1999) ("[A] suitor cannot importune a target board into entering a deal that effectively prevents the emergence of a more valuable transaction or that disables the target board from exercising its fiduciary responsibilities.").

Courts considering the reasonableness of a termination fee must consider factors including the overall size of the fee; its percentage value; the benefits to shareholders offered by the proposed merger; and the preclusive or coercive effects of all other protections in the deal. *See Louisiana Mun. Police Employees Ret. Sys. v. Crawford*, 918 A.2d 1172, 1181 n.10 (Del.

Ch. 2007). "The inquiry, by its very nature fact intensive, cannot be reduced to a mathematical equation." *Id*.  Delaware courts, therefore, have ***explicitly rejected*** the notion that termination fees at any particular percentage of the value of a proposed deal are *per se* permissible.  *See Louisiana Mun. Police Employees'*, 918 A.2d at 1181 n.10 ("Though a '3% rule' for termination fees might be convenient for transaction planners, it is simply too blunt an instrument, too subject to abuse, for this Court to bless as a blanket rule."); *In re Toys R Us S'holder Litig.*, 877 A.2d 975, 1022 (Del. Ch. 2005) (Delaware courts are unwilling "to turn a blind eye to the adoption of excessive termination fees, . . .").  Moreover, as Chancellor Strine of the Delaware Court of Chancery clearly noted, courts should not be "entirely immune to the preclusive differences between termination fees starting with a 'b' rather than an 'm.'"  *In re Toys R Us*, 877 A.2d at 1022, n. 79.

      B.      **The $950 Million Termination Fee Here Is Excessive As A Matter Of Law And Under The Present Circumstances**

"Termination or cancellation fees are not unusual in corporate sale of merger contexts. They are used to reimburse the prospective buyer for expenditures in pursuing the transaction and also for lost opportunities."  *Kysor Industrial Corp. v. Margaux, Inc.*, 674 A.2d 889, 897 (Del. Super. 1996).  There is, however, a point at which the amount of a termination fee is so excessive that it exceeds the bounds of reasonableness and serves no purpose but to freeze out any potential competitive bids.  *See, e.g.*, *Phelps Dodge Corp. v. Cyprus Amax Minerals Co.*, C.A. No. 17398, 1999 Del. Ch. LEXIS 202, at *5 (Del. Ch. Sept. 27, 1999) (stating that 6.3% termination fee "certainly seems to stretch the definition of range of reasonableness and probably stretches the definition beyond its breaking point").  Such is the case here.

The $950 million Termination Fee cannot be justified under any appropriate legal analysis.  Under the express terms of the proposed merger agreement, the $950 million fee is

payable in instances independent of the negotiated expense reimbursement of up to $100 million. The Termination Fee, therefore, has absolutely no relation to any potential costs or risk that Express Scripts may face or may have incurred in making its bid. Rather, the fee here serves one purpose and one purpose only: To make sure that other potential suitors will not have a reasonable opportunity to make a superior bid for the Company.

In this regard, the Delaware Supreme Court's seminal decision in *Revlon v. McAndrews & Forbes Holdings, Inc.*, 506 A.2d 173, 184 (Del. 1986) is instructive. In *Revlon*, the court approved the issuance of an injunction against a $25 million termination fee (just 1/38th of the termination fee at issue here), finding that it was part of an improper plan to thwart competitive bidding. *Id.* at 184. "Market forces must be allowed to operate freely to bring the target's shareholders the best price available for their equity." *Id.* Here, although the $950 million Termination Fee represents approximately 3.26% of the deal value, as discussed above, this percentage alone is not determinative.

That the sheer size of a termination fee can have an improper preclusive effect should come as no surprise to Express Scripts. In challenging a proposed merger between CVS and Caremark in 2007, Express Scripts argued that it was unfairly frozen out of the process. Express Scripts argued that the $675 million termination fee at issue in that case constituted "***an unlawful and per se invalid penalty in violation of Delaware law and public policy***," and an "***improper and coercive penalty that is void ab initio.***" *Express Scripts* Complaint at ¶¶40-41 (attached as Ex. A) (emphasis supplied). *See also, Louisiana. Mun. Police Employees'*, 918 A.2d at 1184 ("[Shareholders plaintiffs and Express Scripts] contend that the individual defendants breached their fiduciary duties by . . . agreeing to a CVS/Caremark merger that contains deal protection measures inconsistent with their fiduciary duties."). Now that Express

11

Scripts is on the other end of the transaction, however, it is seeking to set in place a termination fee that is **140%** the size of a fee that it once denounced as "massive and unreasonable." *Express Scripts* Complaint at ¶33.

Moreover, the Termination Fee impermissibly restricts the Medco Board's ability to perform its fiduciary duties to its shareholders. Should the Medco Board ultimately decide that the merger is not in shareholders' best interest and merely change its recommendation, the Company will incur a whopping $950 million penalty. This self-imposed predicament not only places a heavy thumb on the scale in Express Script's favor, but it effectively precludes Medco's Board from informing the Company's shareholders if an alternative suitor emerges and the directors no longer recommend the Proposed Transaction with Express Scripts. As in the CVS/Caremark merger, the Board has effectively agreed that it will not exercise its fiduciary duties to consider a third-party proposal unless the third party *first* agrees to pay a massive, punitive sum to Express Scripts. *Express Scripts* Complaint at ¶34.

Finally, the termination fee's inappropriate size is even more apparent when compared with Medco's net earnings. According to Medco's most recent 10-K annual report, Medco's net income in 2010 was $1.4 billion. *See* Medco 2010 10-K Statement at p. 41 (attached as Ex. B). Thus, should Medco ultimately decline the merger, the $950 million Termination Fee alone will almost certainly consume the majority of its net income for 2011. If the Termination Fee is left unmodified, the Board and the shareholders will soon be faced with a stark choice – either accede to the merger or sacrifice the better part of a year's earnings.

## II.   MEDCO SHAREHOLDERS FACE IRREPARABLE HARM ABSENT INJUNCTIVE RELIEF

In balancing the equities, the Court must weigh the potential harm to the plaintiff if the injunction is not issued against the potential harm to the defendant if injunctive relief is granted.

*E.g., B.P. Chemicals Ltd., v. Formose Chemical & Fiber Corp.*, 229 F.3d 254, 263 (3d Cir. 2000); *National Reprographics, Inc. v. Strom*, 621 F. Supp. 2d 204, 621 F. Supp. 2d 204, 222 (D. N.J. 2009).  Here, the balance of the equities strongly favors an injunction.  Unless injunctive relief is granted, Medco's shareholders will soon have to vote on the Proposed Transaction under the threat of a Termination Fee which, if activated, will wipe out most of Medco's 2011 earnings.  This massive penalty deters alternate bidders such as Walgreens from making superior offers.  If the Proposed Transaction is consummated, the Board will have eliminated the possibility for Medco shareholders to receive a financially superior offer by precluding a bidding war between other potential acquirers that would almost certainly result in greater consideration for Medco shareholders.  Moreover, it also deters shareholders from exercising their independent judgment as to accept or reject Express Scripts' offer.

By contrast, the burden to Defendants, should Plaintiff's requested relief be granted, is non-existent, or, at most, *de minimis*.  *See*, *e.g.*, *In re Del Monte Foods Co. S'holders Litig.*, C.A. No. 6027-VCL 2011 WL 2535256, at *6 (Del. Ch. June 27, 2011) (discussing preliminary injunction of proposed merger and enforcement of deal protection devices including termination fee).  Due to the need to obtain regulatory approval, Medco and Express Scripts have represented that the Proposed Transaction is expected to close during the first half of 2012.  Allowing expedited consideration of Plaintiffs' challenge to the unlawful termination fee would not delay the anticipated closing schedule, nor would it interfere with Medco's and Express Scripts' efforts to seek regulatory approval.  Under these circumstances, Defendants would face no harm at all if Plaintiffs' request for expedited proceedings is granted.

### A.  Plaintiff's Requested Expedited Discovery Is Reasonable In Light Of All Surrounding Circumstances

In conjunction with their motion for expedited proceedings, Plaintiffs also seek the Court's approval to engage in limited discovery relating to the Proposed Transaction. In particular, Plaintiff seeks information relating to the Board's negotiation of the Merger Agreement with Express Scripts, specifically the prohibitive Termination Fee. Central to Plaintiff's claims for breach of fiduciary duty is the Board's consideration, or lack thereof, of the preclusive and punitive effect of the outsized Termination Fee and the Board's consideration of other alternatives before executing the merger agreement. In addition, evidence illustrating the preclusive effect of the Termination Fee is central to the provision of the injunctive relief requested herein, and should be discoverable immediately.

Annexed hereto as Exhibit C is Plaintiff's proposed first request for production of documents directed to the Medco and the Individual Defendants, submitted for Court approval and contemporary service upon Defendants. The taking of early discovery in this case is necessary to more fully develop, for the Court's consideration, a factual record to support an application for a preliminary injunction. The limited expedited discovery that is sought is reasonable in scope and is necessary to protect Plaintiff and the putative class. Because the document requests are narrowly tailored and only a small number of depositions are sought, the expedited discovery sought here will not cause undue hardship to Defendants.

Such discovery is relatively limited and will not unduly burden the Defendants. Counsel for Plaintiff and the putative class will, of course, cooperate with counsel for the Defendants to reasonably accommodate the difficulties presented by expedited discovery. If allowed the full amount of time under the Rules to respond to the Complaint, receive and then to respond to discovery requests, Plaintiff would likely not receive objections to document requests until late

14

fall. Similarly, if discovery is not expedited and is allowed to proceed in the ordinary course, depositions could not be scheduled until the winter, or perhaps not until next year. Based upon the foregoing, expedited discovery relating to the Proposed Transaction is essential so that Plaintiff will have a reasonable opportunity to obtain and thus, benefit from, the information necessary to support a proper application for a preliminary injunction in time for the Court to consider enjoining the merger.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for expedited proceedings should be granted.

Dated: August 1, 2011

Respectfully submitted,

CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.
Attorneys for Plaintiff

By: *James E. Cecchi*
     JAMES E. CECCHI

Of Counsel:

Mark Lebovitch
Brett M. Middleton
Jeremy Friedman
BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

Jay W. Eisenhofer
Michael J. Barry
GRANT & EISENHOFER P.A.
1201 N. Market Street
Wilmington, Delaware 19801
(302) 622-7000