## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

IN RE:

MEDCO/EXPRESS SCRIPTS MERGER
LITIGATION

Civil Action No. 11-4211(DMC)(MF)

---

## CLASS PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR CERTIFICATION OF SETTLEMENT CLASS, APPROVAL OF NOTICE PLAN, AND PRELIMINARY APPROVAL OF PROPOSED CLASS SETTLEMENT

---

James E. Cecchi
Lindsey H. Taylor
Donald A. Ecklund
CARELLA, BYRNE, CECCHI
   OLSTEIN, BRODY & AGNELLO
5 Becker Farm Road
Roseland, New Jersey 07068
(973) 994-1700

Jay W. Eisenhofer
Michael J. Barry
Caitlin Moyna
GRANT & EISENHOFER P.A.
1201 N. Market Street
Wilmington, Delaware 19801
(302) 622-7000

Gerald Silk
Mark Lebovitch
Brett M. Middleton
Jeremy Friedman
BERNSTEIN LITOWITZ BERGER
   & GROSSMANN LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

*Attorneys for Plaintiff*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT .......................................................................... 1

STATEMENT OF THE CASE

    A. Procedural History ................................................................ 3

    B. Medco's Business and Negotiation of the Merger ..................... 6

        1. Announcement of the Merger ...................................... 7

        2. Lock-up Provisions in the Merger ............................... 7

    C. The Settlement ................................................................... 10

ARGUMENT

I. THE SETTLEMENT CLASSHOLD SHOULD BE CERTIFIED ................. 11

    A. Standard of Review ............................................................. 11

    B. Class Certification Should Be Granted for Settlement Purposes under Rule 23 ......... 12

    C. The Proposed Class Satisfies the Criteria of Rule 23(a) ............. 12

        1. Numerosity .......................................................... 12

        2. Commonality ........................................................ 14

        3. Typicality ............................................................ 13

        4. Adequacy ............................................................ 15

    D. The Proposed Class Satisfies the Criteria of Rule 23(b) ............ 17

II. THE PROPOSED SETTLEMENT IS FAIR, REASONABLE AND ADEQUATE,
    MERITING PRELIMINARY COURT APPROVAL ............................... 20

    A. The Preliminary Fairness Determination ................................ 20

    B. The Girsch Factors ............................................................ 21

        1. Complexity, Expense and Likely Duration of Litigation ......... 21

2. The Reaction of the Class to the Settlement .................................................... 22

3. The Stage of Proceedings and the Amount of Discovery is Completed .............. 22

4. Risks of Establishing Liability ........................................................................ 23

5. Risks of Establishing Damages ....................................................................... 24

6. Risks of Maintaining Class Action Status Through Trial ................................. 25

7. Ability to Withstand Greater Judgment .......................................................... 26

8/9. The Range of Reasonableness of the Settlement Fund in Light of the
Best Possible Recovery and All the Attendant Risks of Litigation ............... 26

C. The Proposed Notice Plan Satisfies Rule 23 and Due Process ....................... 28

CONCLUSION ........................................................................................................ 30

# TABLE OF AUTHORITIES

CASES

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1998) .................................................. 11

*Armstrong v. Bd. of Sch. Dirs. of City of Milwaukee,* 616 F.2d 305 (7th Cir. 1980) ............. 26

*Augenbuam v. Forman*, 2006 WL 1716916 (Del. Ch. June 21, 2006) ................................ 27

*Baby Neal ex rel. Kanter v. Casey*, 43 F.3d 48 (3d Cir. 1994) .......................................... 14

*Barnes v. American Tobacco, Inc.*, 161 F.3d 127 (3d Cir. 1998) ....................................... 15

*Danvers Motor Co., Inc. v. Ford Motor Co.*, 543 F.3d 141 (3d Cir. 2008) .......................... 15

*Desantis v. Snap-On Tools Co., LLC*, 2006 WL 3068584 (D.N.J. 2006) ............................ 26

*Dewey v. Volkswagen of America*, 728 F. Supp. 2d 546 (D.N.J. 2010) ............................. 16

*Eisenberg v. Chicago Milwaukee Corp.*, 1988 WL 112910 (Del. Ch. Oct. 25, 1988) ............. 27

*Eisenberg v. Gagnon*, 766 F.2d 770 (3d Cir. 1985) ........................................................ 15

*Gen. Tel. Co. of SW v. Falcon*, 457 U.S. 147 (1982) ...................................................... 11

*Girsch v. Jepson*, 521 F.2d 153 (3d Cir. 1975) ............................................................. 21

*Inmates of Northumberland County Prison v. Reish*, 2009 U.S. Dist. LEXIS 126479
     (M.D.Pa. Mar. 17, 2009) ...................................................................................... 18

*In re Cendant Corp. Litig.*, 264 F.3d 201 (3d Cir. 2001) ................................................. 21

*In re Cmty. Bank of N. Virginia*, 418 F.3d 277 (3d Cir. 2005) .......................................... 11

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768
     (3d Cir. 1995) ..................................................................................................... 11

*In re Ikon Office Solutions, Inc. Securities Litigation*, 191 F.R.D. 457(E.D.Pa. 2000) ........... 17

*In re Lear Corp. Shareholder Litig.*, 926 A.2d 94 (Del. Ch. 2007) .................................... 28

*In re Managerial, Professional and Technical Employees Antitrust Litigation*,
     2006 WL 38937 (D.N.J. 2006) ............................................................................... 17

*In re Netsmart Tech., Inc. Shareholder Litig.*, 924 A.2d 171, 207 (Del. Ch. 2007) .............. 28

*In re Prudential Insurance Co. of Am. Sales Practices Litig.*, 962 F. Supp. 450
   (D.N.J. 1997), *aff'd*, 148 F.3d 283 (3d Cir. 1998) ............................................. 12

*In re Prudential Ins. Co. Am. Sales Practice Litig.*, 148 F.3d 283, 317 (3d Cir. 1998) ............ 20

*In re Sch. Asbestos Litig.*, 921 F.2d 1330 (3d Cir. 1986) ............................................. 11

*In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516 (3d Cir. 2004) ............................... 11

*Johnston v. HBO Film Mgmt., Inc.*, 265 F.3d 178 (3d Cir. 2001) ..................................... 14

*Jones v. Commerce Bancorp*, 2007 WL 2085357 (D.N.J. July 16, 2007) ............................ 12

*Lewis v. Curtis,* 671 F.2d 779 (3d Cir. 1982) .......................................................... 16

*Liberty Lincoln Mercury, Inc. v. Ford Mktg. Corp.*, 149 F.R.D. 65 (D.N.J. 1993),
   *vacated and remanded*, 171 F.3d 818 (3d Cir. 1999) ......................................... 12

*MacAndrews & Forbes Holdings, Inc. v. Revlon, Inc.*, 501 A.2d 1239 (Del. Ch. 1985) ............ 24

*Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306 (1950) ................................... 28

*New Directions Treatment Serv. v. City of Reading*, 490 F.3d 293 (3d Cir. 2007) .................. 16

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154 (3d Cir. 2001) ............. 15

*Serio v. Wachovia Securities, LLC*, 2009 WL 900167 (D.N.J. 2009) ................................. 18

*Simon v. KPMG LLP*, 2006 WL 1541048 (D.N.J. 2006) ............................................. 26

*Smith v. Prof'l Billing & Mgt. Serv., Inc.*, 2007 WL 4191749 (D.N.J. Nov. 21, 2007) ............. 12

*Spark v. MBNA Corp.*, 48 Fed. Appx. 385 (3d Cir. 2002) ............................................ 26

*Stewart v. Abraham*, 275 F.3d 220 (3d Cir. 2001) ................................................... 13

*Tech v. United States*, 271 F.R.D. 451 (M.D.Pa. 2010) .............................................. 18

*Thomas v. SmithKline Beecham Corp.*, 201 F.R.D. 386 (E.D.Pa. 2001) .............................. 18

*Weiss v. Mercedes-Benz of North America,* 899 F.Supp. 1297 (D.N.J. 1995) ...................... 23

*West Virginia v. Chas. Pfizer & Co.*, 314 F. Supp. 710 (S.D.N.Y. 1970),
   *aff'd*, 440 F.2d 1079 (2d Cir. 1971) ............................................................. 23

**OTHER AUTHORITIES**

Fed. R. Civ. P. 23 ............................................................................................................ 11

MANUAL FOR COMPLEX LITIGATION. (SECOND), § 30.44 (1985) ................................. 21

MANUAL FOR COMPLEX LITIGATION, § 21.633 (4th ed. 2004) .................................... 12

## PRELIMINARY STATEMENT

This motion is brought pursuant to Rule 23(e) seeking preliminary approval of a proposed settlement which will resolve the claims asserted in this litigation.  This action and related settlement raise the bar for the benefits obtained by a shareholder plaintiff in expedited merger litigation.   Plaintiff Louisiana Municipal Police Employees' Retirement System ("LAMPERS" or "Plaintiff"), on behalf of itself and all other similarly situated public shareholders of Medco Health Solutions, Inc. (hereafter, "Medco" or the "Company") and Plaintiff's counsel[1] caused Defendants Medco and  Express Scripts, Inc. ("Express Scripts") to substantially rewrite the terms and timing of their merger.   Settlement of this action not only severely modified deal protections that virtually precluded the Medco board of directors (the "Medco Board" or the "Board") from entertaining competing proposals for the Company, it also eliminated ambiguity and time constraints that interfered with a fully informed merger vote. Most notably, this action has achieved an unprecedented $300 million reduction in a merger termination fee that stood in the way of the Board exercising its legally prescribed fiduciary duty to act in the best interest of the Company's shareholders.

On July 21, 2011, after a series of setbacks in its business operations, the Company announced that the Board agreed to sell the Company to Express Scripts for roughly $71.36 per Medco share.  The purchase price consists of $28.80 in cash and 0.81 Express Scripts shares for each Medco share (the "Proposed Transaction").  The Proposed Transaction values Medco at approximately $29 billion.

While the Company and the Board insisted that the Company's recent setbacks, including one announced the same day as the Proposed Transaction, were unrelated to the Proposed

Transaction, Medco shareholders were left to believe that the Board had simply given up on running the apparently troubled Company.  This sentiment was underscored by the humble premium offered in the deal.  Most concerning for Medco shareholders, however, were the deal protections in the Agreement and plan of Merger (the "Merger Agreement") that created tremendous hurdles to any potential superior offers.

After Plaintiff filed this action on July 22, 2011, counsel for Defendants went on an overt campaign to shift the adjudication of the underlying claims to their preferred forum – the Delaware Court of Chancery.  While Plaintiff and Plaintiff's counsel were trying to effectively litigate the merits of this action, Defendants and their counsel were imposing an additional burden by way of extensive motion practice and gamesmanship undertaken for the sole purpose of litigating in their favored court and against the prosecution counsel of their liking.

Nonetheless, through zealous advocacy and eventual settlement, Plaintiff and Plaintiff's counsel were able to achieve remarkable relief for Medco shareholders in the form of revision of the Merger Agreement made in conjunction with additional disclosures and a beneficial delay in the merger vote date.

---

[1]     Plaintiff's counsel, as used herein, refers to Carella, Byrne, Cecchi, Olstein, Brody & Agnello; Bernstein Litowitz Berger & Grossmann LLP; and Grant & Eisenhofer P.A.

## STATEMENT OF THE CASE

### A.    Procedural history

This action was filed on July 22, 2011, seeking to enjoin the then-recently announced agreement by Defendant Express Scripts to purchase Defendant Medco.  It was filed the same afternoon as another complaint that was filed in the Delaware Court of Chancery, which also challenged the Proposed Transaction.  Plaintiff here alleged that the Medco Board breached its fiduciary duty to shareholders because the per-share stock price they negotiated was inadequate relative to the extraordinary deal protection provisions the Board agreed to accept in the Merger Agreement.  In particular, Plaintiff took issue with a virtually unprecedented breakup fee of nearly $1 billion.  *See* Amended Complaint, Docket Entry 10.

As initially announced, the Proposed Transaction was scheduled to close some time in the first half of 2012.  *See* Declaration of Lindsey H. Taylor, Exhibit A ("Taylor Decl. Ex. __."). The Merger Agreement itself provides that the deal is to close by April 20, 2012, unless that deadline is extended by mutual consent.  *See* Section 7.1(b)(ii) of the Merger Agreement, Taylor Decl. Ex. B.

Plaintiff submitted an application for expedited discovery on August 1, 2011.  Defendants did not respond to that application until shortly before a phone conference with Judge Falk on August 3, 2011, when they opposed expedited discovery proceeding here as part of an effort to litigate the allegations related to the Proposed Transaction in their preferred forum, Delaware. On August 8, 2011, Defendants moved to dismiss Plaintiff's complaint for lack of subject matter jurisdiction.  At the same time, Defendants moved to stay this action in favor of the Delaware action which, they argued, was more advanced than this action.

On August 17, 2011, the Court consolidated all of the federal actions and appointed Interim Lead Counsel.  The following day, Plaintiff moved for class certification.    Defendants

then opposed the motion for class certification - notwithstanding the fact that the class certification issues were substantially identical to the class certification issues in Delaware – in a continued campaign to relocate the adjudication of this case to their favored forum.  Defendants' also opposed expedited briefing with respect to class certification here.

By way of Opinion dated September 19, 2011, the Court denied Defendants' motion to dismiss and for a stay.  The Court found that Plaintiff had pled sufficient facts to satisfy the $75,000 jurisdictional threshold and thus, subject matter jurisdiction existed.  The Court further found that Defendants had failed to satisfy the criteria for a stay. On September 23, 2011, in an unending effort to delay this litigation and allow the Delaware actions a "head start" that Defendants could point to as a reason why these claims should be adjudicated there, Defendants moved to certify the Court's order denying their motion to dismiss for appeal pursuant to 28 U.S.C. § 1292(b), and for a stay pending appeal.  Plaintiff opposed this motion, arguing that Defendants had failed to satisfy the requirements of § 1292(b).

On October 6, 2011, Aristotle Holdings, Inc., ("Aristotle") an affiliate of Express Scripts formed for purposes of the merger, filed a joint preliminary proxy statement on behalf of Express Scripts and Medco with the Securities Exchange Commission ("SEC").[2]  The preliminary proxy statement had blanks for a date sometime within 2011 for the shareholder votes to approve the proposed merger.  Similarly, in a statement filed with the SEC on Thursday, October 20, 2011, Express Scripts stated that it expected a shareholder vote for both companies "to happen around the end of the year."[3]  At a court conference in Delaware on October 21, Express Scripts' counsel stated that its shareholder vote may be scheduled for December 16, 2011, far sooner than

---

[2]     *See* October 6, 2011, Aristotle Form S-4 Proxy Statement "Proxy," Taylor Decl. Ex. C.

[3]     Taylor Decl. Ex. D.

- 4 -

it appeared earlier in the litigation.[4]  *See* Docket Entry 84-3, at 17-18.  This ambitious schedule was a shock to Medco stockholders who were given the impression by the Company that the Proposed Transaction was not on track to close until well into 2012.  It also left Medco stockholders at a loss as to why they would be forced to vote on the Proposed Transaction that was still subject to months of regulatory scrutiny that it might not survive.

On October 25, 2011, the Court granted Defendants' motion to certify for appeal the denial of their motion to dismiss, but denied Defendants' motion for a stay pending appeal.

On October 27, 2011, Plaintiff filed an Order to Show Cause seeking a preliminary injunction to stop the scheduled shareholder vote and to enjoin enforcement of certain deal protection provisions in the Merger Agreement, which are described below.  Express Scripts opposed this application, predictably arguing that any injunction application should be heard in Delaware, not New Jersey.

On October 31, 2011, Express Scripts filed with the Third Circuit a petition for leave to appeal, a motion for a stay pending appeal, and a motion for expedited treatment of its appeal. Medco joined these applications.  The Third Circuit directed that Plaintiff file opposition papers by Friday, November 4 and that Express Scripts file reply papers by Monday, November 7.

While those applications were being briefed, counsel for the parties negotiated a settlement in principle, the terms of which are explained below.  The settlement was approved by both Express Scripts and Medco's boards of directors on Tuesday, November 8, 2011.

---

[4]      Since Express Scripts set at least a target date for a shareholder vote, the Delaware court directed the parties there to file both a consolidated amended complaint and an application for a preliminary injunction.  *See* Docket Entry 84-3, 84-4.

**B.**     <u>**Medco's Business and Negotiation of the Merger**</u>

Medco is a pharmaceutical benefits provider.  A material part of its business is managing the pharmaceutical needs of large institutions and health insurance plans.

In March 2011, a report by Steptoe & Johnson LLP, outside counsel to one of the largest health benefits providers in the world, California Public Employees Retirement System's ("CalPERS"), revealed that Medco had paid a former CalPERS' board member $4 million to help secure for Medco a contract with CalPERS.  *See* Taylor Exs. E & F.  Following the disturbing revelation of this apparent act of bribery, CalPERS dropped Medco from the list of potential candidates to administer prescription drug benefits for the fund's members.  Medco has also been subjected to several lawsuits and government investigations relating to these alleged improprieties.

Just before and following disclosure of the CalPERS scandal, Medco lost several significant contracts.  In January 2011, MemberHealth, LLC ("MemberHealth") provided the Company with notice that it was terminating its Medicare Part D prescription benefits management agreement with Medco at the end of 2011.  On May 27, 2011, Medco announced that the Blue Cross Blue Shield Association planned to transition its mail order and specialty pharmacy benefit coverage for the Federal Employee Program ("FEP") to an alternate provider, effective January 1, 2012.  Then on July 21, 2011, the same day Medco announced the Proposed Transaction, the Company revealed that UnitedHealthcare had declined to renew a contract worth roughly $11 billion.  *See* Taylor Decl. Ex.  G.  Additionally, Medco had recently received a subpoena from the United States Department of Justice ("DOJ") requesting documents related to the Company's relationship with drug-maker AstraZeneca PLC.  *See* Taylor Decl. Ex. H.

Despite revelation of the alleged bribery, the loss of the MemberHealth, FEP, and UnitedHealthcare contracts, and the DOJ subpoena, the Company's financial performance remained remarkably stable.  In fact, Medco has reported record revenues during the most recent quarters.  *See* Taylor Decl. Ex. I.  However, the burgeoning scandals threaten the continued tenure with the Company of Medco's Chief Executive Officer ("CEO"), and likely a broader swath of its senior management.

### 1.     Announcement of the Merger

On July 21, 2011, the same day Medco announced the loss of the UnitedHealthcare Contract, Express Scripts and Medco announced that the companies had entered into a the Merger Agreement whereby Express Scripts would acquire its smaller rival in a deal worth roughly $22 billion.  In a conference call shortly thereafter, Medco admitted that losing the UnitedHealthcare contract was a factor in agreeing to a deal with Express Scripts, but insisted that the negotiations "were on completely independent tracks and came to their own independent conclusion."

Pursuant to the Merger Agreement, Express Scripts will pay $28.80 in cash and 0.81 of an Express Scripts share for each Medco share, valuing the Company at $71.36 per share at the time of the announcement.  *See* Proxy at 3, Taylor Decl. Ex. C.    Despite the size and regulatory complexities of the Proposed Transaction, the deal was negotiated and documented in less than one month.  *See* Proxy at 79, Taylor Decl. Ex. C.

### 2.     Lock-Up Provisions in Merger Agreement

While Express Scripts and Medco touted the Proposed Transaction as a significant benefit to Medco's shareholders, Express Scripts effectively tied Medco's hands against considering a better offer or even changing its recommendation of the Proposed Transaction to

Medco shareholders.  Among the "deal protection" terms of the Merger Agreement was a staggering ***$950 million Termination Fee***[5] (the "Termination Fee"), which would be payable by Medco if, among other situations, the Board terminated the Merger Agreement to accept a superior bid.  *See* Section 7.3(e) of the Merger Agreement, Taylor Decl. Ex. B.

> (e)      In the event that (A) this Agreement is, or, at the time of a termination of this Agreement, could have been, terminated pursuant to Section 7.1(b)(ii)[6] or Section 7.1(b)(iv)[7] and (B) a Takeover Proposal (substituting "40%" for "15%" in the definition of "Takeover Proposal") for Plato[8] (whether or not modified after it was first made) is publicly disclosed, announced or otherwise made public (in each case, other than by Aristotle) (1) in the case of Section 7.1(b)(ii), prior to the date of termination and the vote seeking the Plato Stockholder Approval at the Plato Stockholder Meeting had not been taken prior to the seventh (7th) Business Day prior to the Outside Date (as the same may be extended) and (2) in the case of Section 7.1(b)(iv), prior to the date of the Plato Stockholder Meeting, then Plato shall pay to Aristotle on the date of termination, 35% of the Termination Fee plus the Aristotle Expenses (for purposes of this Section 7.3(e), not to exceed $100,000,000), payable by wire transfer of same day funds, on the date of such termination, and (C) if, within one (1) year following such termination, Plato enters into a definitive agreement providing for, or otherwise consummates, a Takeover Proposal (substituting "40%" for "15%" in the definition of "Takeover Proposal"), then Plato shall pay to Aristotle the Termination Fee less any amount of the Termination Fee and any Aristotle Expenses previously paid, by wire transfer of same day funds, by wire transfer of same day funds, upon the earlier of the public announcement of Plato's entry into any such agreement or the consummation of any such transaction. In the event such a Takeover Proposal (substituting 40% for 15% in the definition of "Takeover Proposal") is consummated prior to the termination of this Agreement, then Plato shall promptly pay to Aristotle the Termination Fee.

*See* Section 7.3(e) of the Merger Agreement, Taylor Decl. Ex. B.

---

[5]      "Termination Fee", as defined in Section 8.15 of the Merger Agreement "means an amount equal to $950,000,000."

[6]      This section provides that the Agreement may be terminated if the merger has not closed by April 20, 2012, and the date has not been extended by mutual consent.

[7]      This section provides that the Agreement may be terminated the Medco shareholders do not vote in favor of the merger.

By agreeing to the $950 million Termination Fee, the Medco Board eliminated any possibility of increasing or maximizing shareholder value by essentially foreclosing the possibility of any competing bids.  Indeed, any potential bidder would essentially need to have an additional $1 billion in cash on hand to proceed with an offer.  The Termination Fee was also "single-trigger" meaning that it was payable if the Medco Board simply decided to change its recommendation on the Proposed Transaction, even in the absence of a competing bid.  Thus, a change of recommendation, even if the in the best interest of the Company, was virtually barred by prospect of an immediate $1 billion cash divestiture.

The Merger Agreement also did not include a "Go-Shop" provision, *i.e.,* a provision that would have allowed Medco's Board to canvas the market to determine whether potential suitors were interested in making a competing bid.  Rather, the Merger Agreement included a "No Solicitation" clause (the "No-Shop"), further limiting the Board's ability to entertain superior strategic alternatives.  *See* Section 5.4(a) of the Merger Agreement, Taylor Decl. Ex. B.  The No-Shop provision was so restrictive that it prevented Medco from even encouraging competing bids for the Company.

Finally, the Medco Board also granted Express Scripts a "Matching Right" in the Merger Agreement that provided Express Scripts six business days to revise its proposal or persuade the Medco Board not to change its recommendation on the merger in the face of a proposal from a third-party suitor.  *See* Section 5.4(b) of the Merger Agreement, Taylor Decl. Ex. B.  The Matching Right dissuaded interested parties from making an offer for the Company by providing Express Scripts the opportunity to make repeated matching bids to counter any competing offers.

---

[8]     Presumably to keep the identities of the parties' secret while the contract was being negotiated, Medco was initially defined in the Merger Agreement as "Plato" and Express Scripts and defined as "Aristotle." *See* Merger Agreement at 1, Taylor Decl. Ex. B.

## C.    <u>The Settlement</u>

While Plaintiff's application for a preliminary injunction and Express Scripts' petition for leave to appeal were pending, counsel for the parties negotiated and agreed to a preliminary settlement agreement that is unparalleled in nature.  First, the settlement provided for substantial modification to the deal protection terms in the Merger Agreement.  Most notably, the Termination Fee was reduced by an unprecedented $300 million.  Unless Medco were to terminate the Agreement with no competing bid having been made, the Termination Fee was reduced from $950 million to $650 million.  Further, the Matching Right was modified to allow Express Scripts only one opportunity, rather than unlimited opportunities, to match a competing bid.  The settlement also provided that Express Scripts and Medco would include additional disclosures in the final proxy statement that was filed on November 18, 2011 and distributed to both companies' shareholders in soliciting approval of the Proposed Transaction.  Finally, in order to allow the therapeutic benefits of the reduction in the deal protections and the fulsome disclosures to take effect, Express Scripts and Medco agreed to postpone a shareholder vote to approve the merger to no earlier than December 21, 2011.

## ARGUMENT

### I.      THE SETTLEMENT CLASS SHOULD BE CERTIFIED

Plaintiffs respectfully request that a Class be certified for settlement purposes pursuant to Rule 23(b)(1) and (b)(2). For the reasons set forth below, certification under these Rules is appropriate because Express Scripts and Medco could be subjected to differing standards of conduct if claims of individual class members were prosecuted on an individual basis, and because the relief sought in the Settlement is exclusively injunctive and declaratory.

### A.      Standard of Review

"There is an overriding public interest in settling class action litigation, and it should therefore be encouraged." *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 535 (3d Cir. 2004); *see also In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 784 (3d Cir. 1995) ("the law favors settlement, particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation"); *In re Sch. Asbestos Litig.*, 921 F.2d 1330, 1333 (3d Cir. 1990) (noting Third Circuit's policy of "encouraging settlement of complex litigation that otherwise could linger for years"); *In re Cmty. Bank of N. Virginia*, 418 F.3d 277, 299 (3d Cir. 2005) ("all Federal Circuits recognize the utility of … 'settlement classes' as a means to facilitate the settlement of complex nationwide class actions") (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 618 (1998)).

Preliminary approval of a class action settlement involves two fundamental inquiries. First, the Court must determine whether a class can be certified under Rule 23. *Amchem Prods.*, 521 U.S. at 620. A "rigorous analysis" is applied to ensure that each requirement for class certification is satisfied. *Gen. Tel. Co. of SW v. Falcon*, 457 U.S. 147, 161 (1982). In certifying a class for settlement purposes, "a district court need not inquire whether the case, if tried, would

present intractable management problems . . . for the proposal is that there be no trial." *Amchem*, 521 U.S. at 620.  Undiluted attention to the remaining requirements is of vital importance.  *Id.*

The second inquiry is whether the proposed settlement appears "fair, reasonable and adequate." Fed. R. Civ. P. 23(e); *Warfarin Sodium*, 391 F.3d at 534.  "Preliminary approval is appropriate where the proposed settlement is the result of the parties' good faith negotiations, there are no obvious deficiencies and the settlement falls within the range of reason." *Smith v. Prof'l Billing & Mgt. Serv., Inc.*, 2007 WL 4191749, at *1 (D.N.J. Nov. 21, 2007); *Jones v. Commerce Bancorp*, 2007 WL 2085357, at *2 (D.N.J. July 16, 2007).

**B.      Class Certification Should Be Granted For Settlement Purposes under Rule 23**

Rule 23(a) sets forth four prerequisites to class certification applicable to all class actions, including classes for purposes of settlement:  (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation.  Fed. R. Civ. P. 23(a); *see also Warfarin Sodium*, 391 F.3d at 527; *see also Amchem*, 521 U.S. at 613.  In addition, the class must meet one of the three prerequisites of Rule 23(b).  Fed. R. Civ. P. 23 (b); *Cmty. Bank*, 418 F.3d at 302; *see also* Manual for Complex Litigation, § 21.633 (4th ed. 2004).

**C.      The Proposed Class Satisfies the Criteria of Rule 23(a)**

**1.      Numerosity**

Rule 23(a)(1) requires that the class be so numerous that joinder of all class members is "impracticable." *Liberty Lincoln Mercury, Inc. v. Ford Mktg. Corp.*, 149 F.R.D. 65, 73 (D.N.J. 1993), *vacated and* remanded, 171 F.3d 818 (3d Cir. 1999).  For purposes of Rule 23(a)(1), "impracticable" does not mean impossible, "only that 'common sense' suggests that it would be difficult or inconvenient to join all class members." *See In re Prudential Insurance Co. of Am. Sales Practices Litig.*, 962 F. Supp. 450, 510 (D.N.J. 1997), *aff'd*, 148 F.3d 283 (3d Cir. 1998);

- 12 -

*see also Stewart v. Abraham*, 275 F.3d 220, 226-27 (3d Cir. 2001) (numerosity requirement satisfied "if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40").

There are many thousands of Medco shareholders across the country, owning over 387 million shares of stock.  Given the number and geographic distribution of the Class members, joinder of all Class members would be impracticable, and the proposed Settlement Class easily satisfies Rule 23's numerosity requirement. *Liberty Lincoln Mercury, Inc.* 149 F.R.D. at 74.

### 2.    Commonality

The Rule 23(a)(2) requirement is satisfied where, as here, there exist "questions of fact and law which are common to the class."  All questions of fact and law need not be common to satisfy the rule.  Rather, the commonality requirement is easily satisfied by the existence of one common question of law or fact.  *Warfarin Sodium*, 391 F.3d at 527-28; *see also Baby Neal ex rel. Kanter v. Casey*, 43 F.3d 48, 56 (3d Cir. 1994) (commonality requirement not demanding because it may be satisfied by a single common issue). "Because the [commonality] requirement may be satisfied by a single common issue, it is easily met."  *Baby Neal ex rel. Kanter*, 43 F.3d at 56.

Here, Plaintiff is asserting claims on behalf of all Medco shareholders, alleging that the Defendant board members breached their fiduciary duty in agreeing to certain lock-up provisions in the Merger Agreement.  Defendants acted on a common basis with respect to all shareholders, since those lock-up provisions affected all shareholders equally.  The agreed changes to those lock-up provisions, and the additional disclosures to be added to the final proxy statement, likewise affect all shareholders equally.  Rule 23(a)(2)'s requirement of a common question of law or fact is satisfied.

### 3.    Typicality

Rule 23(a)(3) requires that the claims or defenses of the representative parties are typical of the claims or defenses of the class and seeks to ensure that the interests of the named plaintiffs align with those of the class. *Baby Neal ex rel Kanter*, 43 F.3d at 57. In considering typicality under Rule 23(a)(3), the court must determine whether "the named plaintiffs' individual circumstances are markedly different or…the legal theory upon which the claims are based differs from that upon which the claims of other class members will be based." *Johnston v. HBO Film Mgmt., Inc.*, 265 F.3d 178, 184 (3d Cir. 2001) (citations omitted). Typicality does not require that all class members share identical claims. *Id.* The typicality requirement is permissive: representative claims are "typical" if they are reasonably co-extensive with those of absent class members; they need not be substantially identical. *See Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 183-84 (3d Cir. 2001); *Barnes v. Am. Tobacco, Inc.*, 161 F.3d 127, 141 (3d Cir. 1998). Courts have held that if the claims of the named plaintiffs and putative class members involve the same conduct by the defendant, typicality is established regardless of the factual differences. *Danvers Motor Co., Inc. v. Ford Motor Co.*, 543 F.3d 141, 150 (3d Cir. 2008) ("factual differences will not defeat typicality if named plaintiffs' claims arise from same event or course of conduct that gives rise to claims of other class members and are based on same legal theory") (citations omitted); *Eisenberg v. Gagnon*, 766 F.2d 770, 786 (3d Cir. 1985) (typicality not defeated by investments in different limited partnerships because claims were based on same alleged omissions and misrepresentations).

Typicality is readily established here. Plaintiff's circumstances are exactly the same as all other Medco shareholders and the legal theory upon which its claims are based are exactly the same as those of other Medco shareholders. Indeed, the reason that Plaintiff's claims are typical is the same reason why there are common issues. Defendants acted or failed to act in the same

manner identically with respect to all shareholders.  Accordingly, they suffered the same injury. The typicality requirement is satisfied.

### 4.   **Adequacy**

Rule 23(a)(4) requires that class representatives "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The adequacy requirement is met if plaintiffs: (1) are represented by competent counsel; and (2) the named plaintiffs' interests are sufficiently aligned with the interests of the putative class members.  *GM Trucks*, 55 F.3d at 800.  Here, the requirements for adequacy are satisfied.

The first requirement, the competency of counsel, is the central focus of the "adequacy" inquiry for complex consumer class actions.  In this case, there is no doubt that Class Counsel are qualified and capable of prosecuting this action.  The Class is represented by law firms with national reputations in the class action field. This Court previously reviewed and considered, and is thus acquainted with, the relevant qualifications and experience of the undersigned firms appointed to serve in leadership roles.  This Court has seen their work on behalf of the class, in this and other cases, as was set forth in their motion for appointment as Interim Class Counsel. This proven track record demonstrates their ability to prosecute this class action with vigor.  *New Directions Treatment Serv. v. City of Reading*, 490 F.3d 293, 313 (3d Cir. 2007).

The second requirement is also met because the Plaintiff's interests are sufficiently comparable with the other Class members to satisfy Rule 23(a)(4). The "adequacy" requirement asks only whether the representative's interests are comparable to those of the absent class members or conflict with those of the class.  *Johnston*, 265 F.3d at 185.  Only a conflict that goes to the very subject matter of the litigation will defeat a party's claim of representative status. *Dewey v. Volkswagen of America*, 728 F. Supp. 2d 546, 567 (D.N.J. 2010); *see also*

*Lewis v. Curtis,* 671 F.2d 779, 788 (3d Cir. 1982).  Here, Plaintiff received the same disclosures and received the same consideration under the Merger as all other shareholders, would have to prove the same facts as any other shareholder to establish its claims, and has precisely the same interest and incentive as any other shareholder to pursue claims related to the Proposed Transaction.  *See Prudential*, 148 F.3d at 313 ("As discussed, the crux of this class action is the allegation that Prudential engaged in a scheme to defraud policyholders by means of company-wide deceptive sales practices. The named parties, like the members of the class, would need to establish this scheme in order to succeed on any of the claims in the Second Amended Consolidated Complaint. Even those class members with 'other' claims share the common task of demonstrating the existence and implementation of this scheme. Consequently, we believe the proposed class satisfies the adequacy of representation requirement of Rule 23(a).")

Additionally, there is no conflict between the Plaintiff and any absent Class member that would interfere with their ability to serve the interests of the Class.  The interests of the Plaintiff are coextensive with the Class, since it brings identical claims and all Class members are therefore fully represented.  Thus, the adequacy requirement of Rule 23(a)(4) is satisfied.

**D.**   **The Proposed Class Satisfies the Criteria of Rule 23(b)**

In the present case, the Plaintiff seeks certification under Rule 23(b)(1) and (2).  Rule 23(b)(1) allows certification of a class if:  a) prosecuting separate actions would create a risk of inconsistent judgments which would establish incompatible standards of conduct for the party opposing the class or b) if adjudicating the claims of individual class members would, as a practical matter, be dispositive of the interests of non-party class members or impede their abilities to protect their own interests. Rule 23(b)(1) defines two types of class actions designed to prevent prejudice to parties arising from multiple potential suits involving the same subject

matter.  *In re Managerial, Prof'l & Technical Emps. Antitrust Litig.*, 2006 WL 38937 at *4 (D.N.J. 2006).  The difference between the two subsections sections is that Rule 23(b)(1)(A) focuses on possible prejudice to the defendants while Rule 23(b)(1)(B) focuses on possible prejudice to the plaintiffs.  *In re Ikon Office Solutions, Inc. Securities Litig.*, 191 F.R.D. 457, 466 (E.D.Pa. 2000).  Rule 23(b)(2) allows certification of a class where the party opposing the class has acted or refused to act in a manner generally applicable to the class, so that final injunctive or declaratory relief would be appropriate with respect to the class as a whole.  Rule 23(b)(2) classes are limited to class actions seeking primarily injunctive or declaratory relief.  *Barnes v. American Tobacco, Inc.*, 161 F.3d 127, 142 (3d Cir. 1998).

Rule 23(b)(1) allows for the certification of a class if:

> the prosecution of separate actions by or against individual members of the class would create a risk of
>
> (A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or
>
> (B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

Rule 23(b)(2) allows for certification of a class if "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole."  The plaintiff must make two showings in order to proceed under Rule 23(b)(2).  First, the complaint must seek relief which is predominantly injunctive or declaratory.  Second, the plaintiff must demonstrate that defendants acted or refused to act on grounds generally applicable to the class.

- 17 -

The second requirement is shown when defendant's conduct constitutes a pattern of activity. *Thomas v. SmithKline Beecham Corp.*, 201 F.R.D. 386, 397 (E.D.Pa. 2001).

Both Rule 23(b)(1) and 23(b)(2) classes are mandatory classes, *i.e.,* no opt-outs are allowed. *See Thomas*, *id*.; (Rule 23(b)(1)); *Serio v. Wachovia Securities, LLC*, 2009 WL 900167 at *5 (D.N.J. 2009)(Rule 23(b)(2)).

Here, Plaintiff has satisfied the criteria of both Rule 23(b)(1) and 23(b)(2).  The Class satisfies Rule 23(b)(1)(A) because there is a significant risk that if individual cases were brought on behalf of shareholders, portions of the Merger Agreement might be found to be invalid in one case, other portions might be invalid in another case, and all of the provisions might be held to be valid in still another case.  This could expose Medco to different standards of conduct with respect to a group to which Medco has an obligation under applicable securities laws and regulations to treat uniformly.

The Class is also certifiable under Rule 23(b)(2) because the settlement relief is exclusively injunctive or declaratory.  "Where injunctive and declaratory reliefs are sought, "the dictates of Rule 23(b) are 'almost automatically satisfied'." *Tech v. United States*, 271 F.R.D. 451, 456 (M.D.Pa. 2010) (quoting *Inmates of Northumberland County Prison v. Reish*, 2009 U.S. Dist. LEXIS 126479, *75 (M.D.Pa. Mar. 17, 2009)).  The settlement consists of Medco and Express Scripts agreeing to modify certain provisions of the Merger Agreement and making additional disclosures set in the proxy statement and other SEC filings in advance of the shareholder vote on the Merger so that shareholders would have more complete information for voting whether to approve the merger.  Further, Medco acted or refused to act, however it might be characterized, on grounds generally applicable to the class.  The terms of the Merger Agreement affect all of Medco's shareholders to the same extent.  Nothing in the Merger

Agreement affects different individual shareholders or different groups of shareholders differently.

## II.   THE PROPOSED SETTLEMENT IS FAIR, REASONABLE AND ADEQUATE, MERITING PRELIMINARY COURT APPROVAL

Rule 23(e) requires a determination by the district court that the proposed settlement is "fair, reasonable and adequate."  *GM Trucks*, 55 F.3d at 785.  As noted above, preliminary approval should be granted where "the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class and falls within the range of possible approval."  *Jones*, 2007 WL 2085357, at *2; *see also Smith*, 2007 WL 4191749, at *1.  The proposed Settlement in this case meets that test because it provides all of the relief which could have reasonably been obtained in litigation.  Accordingly, for the reasons set forth below, it should be preliminarily approved.

### A.   The Preliminary Fairness Determination

Rule 23(e) requires judicial approval for a compromise of claims brought on a class basis. Fed. R. Civ. P. 23(e).  In deciding whether to approve a settlement, the Third Circuit has a strong judicial policy that encourages class settlements especially those that are the product of arm's-length negotiations.  *See In re Prudential Ins. Co. Am. Sales Practice Litig.*, 148 F.3d 283, 317 (3d Cir. 1998); *see also In re Cmty. Bank of N. Virginia*, 418 F.3d 277, 299 (3d Cir. 2005) ("all Federal Circuits recognize the utility of…'settlement classes' as a means to facilitate the settlement of complex nationwide class actions"); *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 784 (3d Cir. 1995) ("the law favors settlement, particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation").  Accordingly, in making its assessment pursuant to Rule 23(e), the Court's intrusion upon what is otherwise a private consensual agreement negotiated between the parties to a lawsuit must be limited to the extent necessary to reach a

reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole is fair, reasonable and adequate to all concerned.   Fed. R. Civ. P. 23(e); *Warfarin Sodium*, 391 F.3d at 534.   "If the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class, and falls within the range of possible approval, then the court should direct that the notice be given to the class members of a formal fairness hearing" MANUAL FOR COMPLEX LITIGATION (SECOND), § 30.44 (1985).   As summarized below, and as will be detailed further in a subsequent motion for final approval of the Settlement, a preview of the factors considered by courts in granting final approval of class action settlements demonstrates that this Settlement is well within the range of possible approval.   Therefore, the Court should allow notice of the settlement to be disseminated to the Class.

**B.**     **The *Girsch* Factors**

The Third Circuit has adopted a nine-factor test to determine whether a settlement is "fair, reasonable, and adequate."   The elements of this test – known as the "*Girsch* factors" – are:

> (1) the complexity and duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining a class action; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement in light of the best recovery; and (9) the range of reasonableness of the settlement in light of all the attendant risks of litigation.

*GM Trucks*, 55 F.3d at 785 (citing *Girsch v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975)).

**1.**     **Complexity, Expense, and Likely Duration of the Litigation**

The first *Girsch* factor "captures the probable costs, in both time and money, of continued litigation."   *In re Cendant Corp. Litig.*, 264 F.3d 201, 233 (3d Cir. 2001).   "By measuring the

costs of continuing on the adversarial path, a court can gauge the benefit of settling the claim amicably." *GM Trucks*, 55 F.3d at 812.

This factor undoubtedly weighs in favor of settlement.  In *Warfarin Sodium*, the parties had already litigated the case for three years.  391 F.3d at 537. Nevertheless, the court concluded that the first *Girsch* factor was satisfied:

> We agree with the District Court's conclusion that this factor favors settlement because continuing litigation through trial would have required additional discovery, extensive pretrial motions addressing complex factual and legal questions, and ultimately a complicated, lengthy trial.  Moreover, it was inevitable that post-trial motions and appeals would not only further prolong the litigation but also reduce the value of any recovery to the class.  In a class action of this magnitude, which seeks to provide recovery for Coumadin consumers and TPPs nationwide, the time and expense leading up to trial would have been significant.

*Id.* at 536.

This matter has already been heavily litigated and the path from this stage of the litigation to a final judgment would likely be much longer and significantly more expensive.  This case involves a complex $32 billion dollar merger.  Litigation of the breach of fiduciary duty claims to conclusion would have involved expensive economic evaluations by investment bankers and other experts retained by both sides, considerable additional fact and expert discovery, and a complex, lengthy trial.

### 2.      The Reaction of the Class to the Settlement

The second *Girsch* factor "attempts to gauge whether members of the class support the settlement."  *Prudential,* 148 F.3d at 318.  Of course, at this stage, the Court cannot measure the number of objectors since class notice has not yet been issued.

### 3.      The Stage of Proceedings and the Amount of Discovery Completed

The third *Girsch* factor "captures the degree of case development that class counsel [had] accomplished prior to settlement. Through this lens, courts can determine whether counsel had

an adequate appreciation of the merits of the case before negotiating." *Cendant*, 264 F.3d at 235; (Citing *GM Trucks*, 55 F.3d at 813).

This inquiry has two aspects: factual and legal. In *Prudential*, for example, the court noted that the parties had filed and argued multiple motions, including case management motions and the defendant's motion to dismiss under Rule 12(b)(6). *Prudential*, 148 F.3d at 319. The factual inquiry involves "an inquiry into the type and amount of discovery the parties have undertaken." *Id.* The discovery considered by the court includes "informal" discovery received from the defendant, third-parties and experts. *See, e.g., GM Trucks*, 55 F.3d at 813 (expert testimony and other evidence from parallel state court proceedings); *Prudential*, 148 F.3d at 319 (witness interviews); *Cendant*, 264 F.3d at 235 (public filings); *Warfarin Sodium*, 391 F.3d at 537 (consultation with experts).

Here, the Settlement reduces or removes significant portions of the lock-up provisions in the Merger Agreement, thus making it easier for a potential other suitor to make a competing bid for Medco. Further, the settlement provides for significant additional information for shareholders when they vote on the proposed merger.

### 4. Risks of Establishing Liability

"By evaluating the risks of establishing liability, the district court can examine what the potential rewards (or downside) of litigation might have been had class counsel elected to litigate the claims rather than settle them." *GM Trucks*, 55 F.3d at 314. "The risks surrounding a trial on the merits are always considerable." *Weiss v. Mercedes-Benz of North America,* 899 F.Supp. 1297, 1301 (D.N.J. 1995); *See also, e.g., West Virginia v. Chas. Pfizer & Co.*, 314 F. Supp. 710, 743-44 (S.D.N.Y. 1970), *aff'd*, 440 F.2d 1079 (2d Cir. 1971) ("No matter how confident one may be of the outcome of litigation, such confidence is often misplaced.")

- 23 -

In the merger context, directors have a duty to exercise informed business judgment.  *See MacAndrews & Forbes Holdings, Inc. v. Revlon, Inc.*, 501 A.2d 1239, 1247 (Del. Ch. 1985) ("Directors faced with the decision to accept or reject a merger agreement must exercise informed business judgment.")  Moreover, directors are required to "'disclose fully and fairly all material information within the board's control when it seeks shareholder action.'"  *MacAndrews & Forbes Holdings, Inc. v. Revlon, Inc.*, 501 A.2d 1239, 1247 (Del. Ch. 1985) (quoting cases).

While Plaintiff was confident that it would ultimately succeed on its claims, it was also aware that this action would continue to be heavily litigated by two of the largest national law firms on behalf of Defendants.   As with any litigation, there are risks inherent in continuing to litigate, but considering that Plaintiff was able to obtain by settlement much of the relief it was seeking in the litigation, it is in the shareholders' best interest to accept the relief provided in the settlement rather than to spend millions of dollars in fees and months of time in an attempt to obtain only a marginally better result through litigation.

### 5.   Risks of Establishing Damages

"Like the fourth factor, this inquiry attempts to measure the expected value of litigating the action rather than settling it at the current time."  *Cendant*, 264 F.3d at 238.  The court looks at the potential damage award if the case were taken to trial against the benefits of immediate settlement.  *Prudential*, 148 F.3d at 319.

In this case, Plaintiffs alleged that Defendants breached their duties of loyalty, care and disclosure in negotiating and approving the Merger with Express Scripts.  Thus, any potential damages award would depend on Plaintiff proving at trial that (a) Defendants breached their duties of care, loyalty or disclosure and (b) that any established breaches caused quantifiable economic harm to Plaintiffs and the putative class of Medco shareholders.  Plaintiff believes that

the Defendants breached their duty of care and loyalty to the shareholders, but quantifying the damages that were caused by the breach of duty could be difficult to quantify because of the actions the Board took contrary to those duties because there were no competing bids for Medco. The deal protection measures which were built into the Merger Agreement were intended to, and, at least so far, successfully, deterred any competing bids for Medco.  Since the Medco Board did not seek other offers in advance of agreeing to merge with Express Scripts, it could be difficult to determine what another company might have been willing to pay for Medco had the company been shopped, as Plaintiff believes it should have been.  Likewise, since the investment bankers gave no valuation of the Company in advance of merger talks with Express Scripts, so there is no baseline to determine whether the price Express Scripts paid was under or over an appropriate valuation.  Without knowing whether any other companies might have been interested in purchasing Medco but for the deal protection measures and what those companies might have been willing to pay, it could be difficult to quantify the monetary damages shareholders incurred as a result of the deal protection measures in the Merger Agreement.

### 6. Risks of Maintaining Class Action Status Through Trial

Because the prospects for obtaining certification have a great impact on the range of recovery one can expect to reap from the class action, *GM Trucks*, 55 F.3d at 817, the court must measure the likelihood of obtaining and maintaining a certified class if the action were to proceed to trial.  *Girsch*, 521 F.2d at 157.  Here, given the nature of Plaintiffs' claims and their satisfaction of the requirements of Rule 23, Plaintiffs did not consider the ability to maintain a class action to pose a significant risk.

- 25 -

7. **Ability to Withstand Greater Judgment**

The seventh *Girsch* factor considers "whether the defendants could withstand a judgment for an amount significantly greater than the [s]ettlement." *Cendant*, 264 F.3d at 240. Plaintiff cannot assert that the Defendants could not afford to pay some amount of damages. On the other hand, the relief Plaintiff sought was primarily injunctive, to eliminate or reduce the break-up fee and to eliminate or reduce Express Scripts' matching rights. Thus, to that extent, Defendants' ability to withstand a greater judgment is an irrelevant consideration.

8/9. **The Range of Reasonableness of the Settlement Fund in Light of the Best Possible Recovery and All the Attendant Risks of Litigation**

The last two *Girsch* factors are usually considered together. They ask "whether the settlement is reasonable in light of the best possible recovery and the risks the parties would face if the case went to trial." *Prudential*, 148 F.3d at 322; *see also Warfarin Sodium*, 391 F.3d at 538 (court should consider "whether the settlement represents a good value for a weak case or a poor value for a strong case"). As Judge Becker explained in *GM Trucks*, "[t]he evaluating court must ... guard against demanding too large a settlement based on its view of the merits of the litigation; after all, settlement is a compromise, a yielding of the highest hopes in exchange for certainty and resolution." 55 F.3d at 806.

At the preliminary approval stage, the Court need only find that the proposed settlement is "in the range of fair and reasonable." *See, e.g., Spark v. MBNA Corp.*, 48 Fed. Appx. 385, 387-88 (3d Cir. 2002); *see also Armstrong v. Bd. of Sch. Dirs. of City of Milwaukee*, 616 F.2d 305, 314 (7th Cir. 1980) ("within the range of possible approval"); *Desantis v. Snap-On Tools Co., LLC*, 2006 WL 3068584, at *5 (D.N.J. 2006) ("within the range of reasonableness"); *Simon v. KPMG LLP*, 2006 WL 1541048, at *8 (D.N.J. 2006) (same).

In making its Rule 23(e) determination, the Court should apply "an initial presumption of fairness when … (1) the settlement negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class object[s]." *Warfarin Sodium*, 391 F.3d at 535; (Citing *Cendant*, 264 F.3d at 232 n.18)..

As is explained above, the significant changes in the deal protection measures are a significant victory for Plaintiff and the shareholders, since that relief is substantially what Plaintiff believes it would have been able to obtain had the case been litigated to a successful conclusion.  Obviously, there is nothing more Plaintiff can do to induce another potential bidder to make a better offer for Medco.  However, by reducing the break-up fee and limiting Express Scripts' matching rights, Plaintiff believes that other potential suitors are far more likely to make a better offer for Medco.

Further, the additional disclosures to be incorporated into the final proxy statement are an additional benefit to shareholders.  Courts routinely recognize the benefits for shareholders when class representatives are successful in negotiating for supplemental disclosures in a proxy statement: "Where a representative shareholder succeeds in correcting invalid disclosures in connection with a transaction between the corporation and its stockholders, our case law recognizes that for fee awarding purposes, the corporation and all of its shareholders are benefitted." *Eisenberg v. Chicago Milwaukee Corp.*, 1988 WL 112910, at *3 (Del. Ch. Oct. 25, 1988); *see also Augenbuam v. Forman*, 2006 WL 1716916, at *2 (Del. Ch. June 21, 2006) ("supplemental disclosures included useful information . . . that permitted stockholders to view the final price term and related information from a materially different perspective.")   As one court described it, disclosures "give[] stockholders the choice to think for themselves on full

information, thereby vindicating their rights as stockholders to make important voting and remedial decisions based on their own economic self-interest." *In re Netsmart Tech., Inc. Shareholder Litig.*, 924 A.2d 171, 207 (Del. Ch. 2007).

However, Plaintiffs also recognized the principle that "when disinterested stockholders make a mature decision about their economic self-interest . . . second-guessing is almost completely circumscribed." *See generally In re Lear Corp. Shareholder Litig.*, 926 A.2d 94, 114-15 (Del. Ch. 2007).

**C.    The Proposed Notice Plan Satisfies Rule 23 and Due Process**

Notice of a proposed settlement must be given to class members in the most practicable manner under the circumstances, describing the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard. *See* Fed. R. Civ. P. 23(c)(2)(B).

As the Supreme Court explained in *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306 (1950):

> An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections … The notice must be of such nature as reasonably to convey the required information, and it must afford a reasonable time for those interested to make their appearance.

*Id.* at 314.   The proposed Notice Program in this case more than satisfies this standard.

Under Rule 23(c)(2)(B), "the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort."

Here, if the Court grants preliminary approval of the Settlement, the proposed Notice will be mailed to the Class, which consists of all Medco shareholders from the date that the Merger

- 28 -

was announced through the date that the Merger closed, will be notified of the Settlement by direct mail.  The proposed Notice Program envisions that Class members will be identified by information in the possession of Medco.  The proposed Notice would be sent to all Class members who were shareholders of record and individual notice will be mailed to all such Class members.  The notice will also request that any such record holders who held shares of Medco for the benefits of others forward copies of the notice to such beneficial holders, and Medco will provide copies of the notice for such forwarding.  Courts routinely find that comparable notice procedures meet the requirements of due process and Rule 23.

The form of the class Notice is governed by Rule 23(c)(2), which provides that "[t]he notice must clearly and concisely state in plain, easily understood language:

     (i)     the nature of the action;

     (ii)     the definition of the class certified;

     (iii)     the class claims, issues, or defenses;

     (iv)     that a class member may enter an appearance through an attorney if the member so desires;

     (v)     that the court will exclude from the class any member who requests exclusion;

     (vi)     the time and manner for requesting exclusion; and

     (vii)     the binding effect of a class judgment on members under Rule 23(c)(3).

Fed. R. Civ. P. 23(c)(2)(B).  The proposed Notice in this case meets all of these requirements. The proposed Notice sets forth all of the applicable information required by Rule 23(c)(2)(B). There is no information relating to exclusion from the Class because the Rules under which the Class is being certified to not allow opt-outs.

## <u>CONCLUSION</u>

For the foregoing reasons, Class Counsel respectfully request that the Court grant the relief requested herein.

CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.
Attorneys for Plaintiff

By:   /s/ *James E. Cecchi*
       JAMES E. CECCHI

Dated:  November 25, 2011

Of Counsel:

Gerald Silk
Mark Lebovitch
Brett M. Middleton
Jeremy Friedman
BERNSTEIN LITOWITZ BERGER
   & GROSSMANN LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

Jay W. Eisenhofer
Michael J. Barry
Caitlin Moyna
GRANT & EISENHOFER P.A.
1201 N. Market Street
Wilmington, Delaware 19801
(302) 622-7000