# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE:<br><br>MEDCO/EXPRESS SCRIPTS MERGER LITIGATION | Civil Action No.<br>11-4211(DMC)(MF) |

---

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR AN AWARD OF ATTORNEYS' FEES AND EXPENSES

---

Lindsey H. Taylor
Donald A. Ecklund
Zachary S. Bower
CARELLA, BYRNE, CECCHI
    OLSTEIN, BRODY & AGNELLO
5 Becker Farm Road
Roseland, New Jersey 07068
(973) 994-1700

Jay W. Eisenhofer
Michael J. Barry
Caitlin Moyna
GRANT & EISENHOFER P.A.
123 Justison Street
Wilmington, Delaware 19801
(302) 622-7000

Gerald Silk
Mark Lebovitch
Brett M. Middleton
Jeremy Friedman
BERNSTEIN LITOWITZ BERGER
    & GROSSMANN LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

*Attorneys for Plaintiff*

# <u>TABLE OF CONTENTS</u>

Page

TABLE OF AUTHORITIES ................................................................. iii

I.     PRELIMINARY STATEMENT .................................................... 1

II.    PROCEDURAL HISTORY ......................................................... 3

III.   FACTUAL BACKGROUND .......................................................... 8

    A.   The Board "Threw In The Towel" And Hastily Entered
        The Proposed Transaction ........................................... 9

IV.    ARGUMENT .......................................................................... 11

    A.   A Fee Is Warranted Under The Common Benefit
        Doctrine ......................................................................... 12

        1.   A Common Benefit Was Achieved For A Readily
            Ascertainable Class ............................................ 13

            a)   Termination Fee .......................................... 16

            b)   Matching Rights .......................................... 17

            c)   Additional Disclosures ................................ 18

            d)   Postponement Of Shareholder Vote ............. 22

        2.   The Additional Factors For The Applicability Of
            The Common Benefit Doctrine Are Satisfied .......... 23

    B.   The Court Should Use The Percentage-Of-Recovery
        Method To Assess The Reasonableness Of The Fee ......... 24

    C.   Plaintiff Seeks A Reasonable Fee Under The Percentage-
        Of-Recovery Doctrine .................................................... 28

        1.   Class Counsel Seeks 11.8% Of The Common
            Benefit ................................................................ 28

        2.   11.8% Is A Reasonable Percentage Of The Benefit
            To Award To Class Counsel ................................ 30

            a)   Complexity Of Litigation ............................. 31

- i -

b)      Contingent Nature Of Litigation ....................................34

c)      Stage Of Proceedings ....................................................35

d)      Competency Of Counsel................................................37

e)      Precedent Supports The Fee Here .................................37

f)      Cross-Check With Lodestar Method.............................38

V.     CONCLUSION.............................................................................40

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Briggs v. Hartford Fin. Servs. Group, Inc.*,
  No. 7-cv-5190, 2009 WL 2370061 (E.D. Pa. July 31, 2009) ................31, 35, 37

*In re Cendant Deriv. Litig.*,
  232 F. Supp. 2d 327 (D.N.J. 2002) .....................................................................37

*In re Compellent Techs., Inc. S'holder Litig.*,
  No. 6084, 2011 WL 6382523 (Del. Ch. Dec. 9, 2011) .............................. *passim*

*In re Computron Software, Inc. Sec. Litig.*,
  6 F. Supp. 2d 313 (D.N.J. 1998) ................................................................26, 35

*Cullen v. Whitman Med. Corp.*,
  197 F.R.D. 136 (E.D. Pa. 2000) ........................................................................37

*Dewey v. Volkswagen of America*,
  728 F. Supp. 2d 546 (D.N.J. 2010) .......................................................25, 29, 39

*In re Diet Drugs Prods. Liab.*,
  582 F.3d 524 (3d Cir. 2009) .......................................................................12, 39

*Eisenberg v. Chicago Milwaukee Corp.*,
  No. 9374, 1988 WL 112910 (Del. Ch. Oct. 25, 1988) ......................................18

*First State Orthopaedics v. Concentra, Inc.*,
  534 F. Supp. 2d 500 (E.D. Pa. 2007) .........................................................32, 38

*In re Genta Sec. Litig.*,
  No. 04-cv-2123, 2008 WL 2229843 (D.N.J. May 28, 2008) ............................25

*Gunter v. Ridgewood Energy Corp*,
  223 F.2d 199 (3d Cir. 2000) .............................................................................35

*In re Ins. Brokerage Antitrust Litig.*,
  579 F.3d 241 (3d Cir. 2009) .............................................................................39

*In re Ins. Brokerage Antitrust Litig.*,
    MDL No. 1663, No. 04-cv-5184, 2009 WL 411856
    (D.N.J. Feb. 17, 2009)..................................................................................12, 24

*Joy Mfg. Corp. v. Pullman-Peabody Co.*,
    742 F. Supp. 911 (W.D. Pa. 1990)..................................................................39

*Kysor Indus. Corp. v. Margauz, Inc.*,
    674 A.2d 889 (Del. Super. Ct. 1996)..............................................................32

*Larson v. Sprint Nextel Corp.*,
    No. 07-cv-5325, 2010 WL 234934 (D.N.J. Jan. 15, 2010) ..............................25

*In re LG/Zenith Rear Projection Television Class Litig.*,
    No. 06-cv-5609, 2009 WL 455513 (D.N.J. Feb. 18, 2009).......................... 25-26

*In re Mercedes-Benz Tele Aid Contract Litig.*,
    MDL No. 1914, 07-cv-2720, 2011 WL 4020862 (D.N.J. Sept. 9, 2011) ..........25

*Merola v. Atlantic Richfield Co.*,
    515 F.2d 165 (3d Cir. 1975) ...........................................................................13

*In re NCS Healthcare S'holders Litig.*,
    No. 19786, 2003 WL 21384633 (Del. Ch. May 28, 2003)................................40

*Phelps Dodge Corp. v. Cyprus Amaz Minerals Co.*,
    No. 17398, 1999 WL 1054255 (Del. Ch. Sept. 27, 1999)................................33

*Polonski v. Trump Taj Mahal Assocs.*,
    137 F.3d 139 (3d Cir. 1998) ...........................................................................13

*In re Rite Aid Corp. Sec. Litig.*,
    146 F. Supp. 2d 706 (E.D. Pa. 2001)..............................................................38

*In re Rite Aid Corp. Sec. Litig.*,
    396 F.3d 294 (3d Cir. 2005) .............................................................24, 25, 38

*In re Safety Components Sec. Litig.*,
    166 F. Supp. 2d 72 (D.N.J. 2001)..............................................................37, 38

*In re Schering-Plough/Merck Merger Litig.*,
    No. 09-cv-1099, 2010 WL 1257722 (D.N.J. Mar. 26, 2010)...........13, 22, 23, 25

*Serrano v. Sterling Testing Sys., Inc.*,
   711 F. Supp. 2d 402 (E.D. Pa. 2010)........................................................24, 25

*In re Smurfit-Stone Container Corp. S'holder Litig.*,
   No. 6164-VCP, 2011 WL 2028076 (Del. Ch. May 20, *revised* May 24,
   2011) ..........................................................................................................34

*State of Wisc. Inv. Bd. v. Bartlett*,
   No. 17727, 2002 WL 568417 (Del. Ch. Apr. 9, 2002)................................14, 15

*Tandycrafts, Inc. v. Initio Partners*,
   562 A.2d 1162 (Del. 1989) ......................................................................14, 18

*In re Toys "R" Us Inc. S'holder Litig*,
   877 A.2d 975 (Del. Ch. 2005) ..........................................................................33

*In re Elec. Data Sys. Class Action Litig.,* No. 366-01078-2008
   (Tex. Dist. Ct. Dec. 23, 2009)..........................................................................19

*In re Warfarin Sodium Antitrust Litig.*,
   212 F.R.D. 231 (D. Del. 2002) ......................................................32, 34, 35, 38

*Weber v. Gov't Emps.Ins. Co.*,
   262 F.R.D. 431 (D.N.J. 2009)..........................................................................39

### STATUTES

28 U.S.C. § 1292(b) ..............................................................................................6

### OTHER AUTHORITIES

*Manual for Complex Litigation 3d*, § 24.121, at 191 ............................................34

F.R.C.P. 23 ............................................................................................................1

F.R.C.P. 54(d)(2)....................................................................................................1

F.R.C.P. 23(h) ......................................................................................................12

Pursuant to Federal Rules of Civil Procedure 23 and 54(d)(2), Plaintiff Louisiana Municipal Police Employees' Retirement System ("LAMPERS" or "Plaintiff") on behalf of itself and all other similarly situated public shareholders (the "Class") of Medco Health Solutions, Inc. ("Medco" or the "Company"), respectfully submits this memorandum of points and authorities in support of its motion for attorneys' fees and expenses.

## I.   <u>PRELIMINARY STATEMENT</u>

The proposed settlement of this action (the "Action") provides valuable benefits to Medco's shareholders in conjunction with the acquisition of Medco by Express Scripts, Inc. ("Express Scripts") (the "Acquisition"). Specifically, Defendants agreed to a settlement which provided the Class with significant and material changes to the deal terms, including an unprecedented $300 million reduction in the termination fee, critical amendments to the matching rights, the inclusion of additional disclosures in the final proxy statement, and postponement of the shareholder vote to approve the merger (the "Settlement"). That Plaintiff was able to achieve such a favorable result speaks both to its commitment to advancing shareholder rights and its attorneys' effort and skill in litigating this case. Plaintiff seeks an award of fees of $18 million, plus out of pocket expenses, an amount Plaintiff believes is commensurate with the benefits achieved through the prosecution of this litigation (the "Action") and the resulting Settlement.

The proposed Settlement, which would resolve all related litigation pending in the three different courts, was the product of zealous prosecution that targeted the illegal deal protections in the proposed Acquisition, ultimately forcing Express Scripts and Medco to rewrite the merger terms to bring them into compliance with applicable Delaware law.   As detailed in the report of Professor Guhan Subramanian (attached as Exhibit C to the accompanying Declaration of Lindsey Taylor ("Taylor Dec.")),  the material changes to the deal terms required under the Settlement, including an unprecedented $300 million reduction in the termination fee and the elimination of unlimited matching rights, provided a quantifiable benefit to Medco's shareholders of between $153 million and $374.8 million. The Settlement also provided additional material disclosures and delayed a vote on the proposed Acquisition to give potential alternative suitors an opportunity to present competing bids, and Medco's shareholders an opportunity to consider the additional disclosures prior to being required to vote on the proposed Acquisition.

Based on these substantial benefits conferred upon Medco's shareholders, Plaintiff seeks a fee award of $18 million, plus out of pocket expenses in the amount of $99,847.67.  Plaintiff's requested fee award for its counsel is inherently reasonable.  The requested fee amount represents a reasonable award based upon the benefits to the Class, and aligns the interests of Class Counsel with that of the Class as a whole.

## II.    <u>PROCEDURAL HISTORY</u>

This case was anything but a typical, cookie-cutter deal litigation where a plaintiff settles early during the case for additional disclosures.  Instead, Plaintiff's Counsel fought the Defendants at every turn until they were in a position to negotiate a meaningful settlement, providing substantial benefits to Medco's shareholders by making the Company more attractive to a potential topping bidder.

On July 21, 2011, Medco announced that the Medco Board agreed to sell the Company to Express Scripts for roughly $71.36 per Medco share.  The purchase price consisted of $28.80 in cash and 0.81 Express Scripts shares for each Medco share (the "Proposed Transaction").  At that time, the Proposed Transaction valued Medco at approximately $29 billion, and was set to close by April 20, 2012, unless that deadline was extended by mutual consent. *See* Taylor Dec. Ex. CC, Merger Agreement, §7.1(b)(ii).  The Merger Agreement contained a "no-shop" clause precluding Medco from soliciting alternative bids (§ 5.4), gave Express Scripts unlimited rights to match any other competitive bid that may emerge (§5.4(b)), and included a provision requiring Medco to pay Express Scripts up to $950 million in order to terminate the agreement in favor of any superior competing bid (§ 7.3(e)).

Medco's announcement, and particularly the onerous deal protections erected in the Merger Agreement, caused immediate outrage by Medco's shareholders.  Between July 22, 2011 and August 8, 2011, ten other cases were

filed by other Medco shareholders in the Delaware Court of Chancery (collectively, the consolidated "Delaware Action")[1] and five cases were filed in the New Jersey Superior Court (the "New Jersey State Action").[2]  By Order dated August 17, 2011, this Court consolidated the seven related actions pending before it, and appointed Carella, Byrne, Cecchi, Olstein, Brody & Agnello, Grant & Eisenhofer P.A., and Bernstein Litowitz Berger & Grossmann LLP as Interim Lead Counsel for Plaintiffs ("Class Counsel").  In its Amended Complaint, Plaintiff alleged that the Medco Board breached their fiduciary duties owed to shareholders under Delaware law because the consideration offered was inadequate and certain deal protection provisions in the Merger Agreement, particularly a breakup fee of nearly $1 billion, violated Delaware law. *See* Am. Compl., D.I. 10.

From the inception of the litigation before this Court, Defendants actively

---

[1]  *Chevedden v. Snow*, C.A. No. 6694-CS (Del. Ch.); *Colanino v. Medco Health Solutions, Inc.*, C.A. No. 6708-CS (Del. Ch.); *Knisley v. Snow*, C.A. No. 6710-CS (Del. Ch.); *Heimowitz v. Medco Health Solutions, Inc.*, C.A. No. 6711-CS (Del. Ch.); *Wabner v. Medco Health Solutions, Inc.*, C.A. No. 6716-CS (Del. Ch.); *U.F.C.W. Local 1996 & participating Emps. Pension Fund v. Medco Health Solutions, Inc.*, C.A. No. 6720-CS (Del. Ch.); *Westchester Putnam Counties Heavy & Highway Laborers Local 60 Benefit Funds v. Medco Health Solutions, Inc.*, C.A. No. 6723-CS (Del. Ch.); *Labourers' Pension Fund of Cent. & E. Can. v. Snow*, C.A. No. 6725-CS (Del. Ch.); *Johnson v. Medco Health Solutions, Inc.*, C.A. No 6726-CS (Del. Ch.); and *Schoenwald. v. Medco Health Solutions, Inc.*, C.A. No. 6727-CS (Del. Ch.).

[2]  *Lasker v. Medco Health Solutions, Inc.*, No. C-246-11 (N.J. Super. Ct.); *Levinson v. Snow*, No. C-000215-11 (N.J. Super. Ct.); *Kramer v. Snow*, No. C-217-11 (N.J. Super. Ct.); *Snider v. Medco Health Solutions, Inc.*, No. C-220-11 (N.J. Super. Ct.); and *Prongay v. Medco Health Solutions, Inc.*, No. C-232-11 (N.J. Super. Ct.).

sought to impede the prosecution of the case in order to prevent this Court from considering the merits of Plaintiff's claims.  On August 1, 2011, Plaintiff submitted an application for expedited discovery.  Defendants opposed that request and instead moved to dismiss Plaintiff's complaint for lack of subject matter jurisdiction on August 8, 2011.  After consolidation, on August 18, 2011, Plaintiff moved for class certification.  Defendants opposed that motion, and opposed any effort to expedite briefing on Plaintiff's motion.

Meanwhile, several of the plaintiffs in the Delaware Action filed competing motions for consolidation, class certification, and appointment of lead counsel.  Despite opposing similar motions filed in this Court, Defendants consented to consolidation and the certification of a class in the Delaware Action.  Defendants hand-selected a preferred plaintiff in that forum to engage in a brief deposition on class certification issues, and consented to the appointment of that shareholder as lead plaintiff in Delaware.  *See* Express Scripts' Response to Plaintiff U.F.C.W. Local 1776 & Participating Employers Pension Fund's Motion for Class Certification, filed in *Chevedden v. Snow, et al.*, C.A. No. 6694-CS (Del. Ch.), and each of the Delaware Actions.

On August 23, 2011, the Delaware Court of Chancery entered an order certifying a non-opt out class of all record holders and beneficial owners of common stock of Medco together with their successors and assigns, during the

period commencing on the date on which the Medco Board approved the proposed acquisition of all of Medco's shares by Express Scripts and ending at the effective time of the closing of the proposed transaction, and appointed Co-Lead Counsel and Liaison Counsel for the class.  In light of this Order, on August 26, 2011, the New Jersey Superior Court granted a Consent Order, staying the New Jersey State Action in favor of the Delaware Action and ordering that plaintiffs in the New Jersey State Action would be bound by the Delaware Action.

On August 8, 2011, Defendants moved to stay this Action in favor of the Delaware Action that they claimed (based on their decision to consent to class certification in Delaware) had advanced further than this Action.  By way of Opinion dated September 19, 2011, this Court denied Defendants' motion.  Not content with this Court's jurisdictional ruling, on September 23, 2011, Defendants moved to certify this Court's order denying their motion to dismiss for appeal pursuant to 28 U.S.C. § 1292(b), and for a stay pending appeal.  Plaintiff filed papers in opposition to this appeal.  Meanwhile, on October 14, 2011, Express Scripts filed a Motion for Judgment on the Pleadings and Proposed Order for Briefing Schedule on their Motion for Judgment on the Pleadings in the Delaware Action.  On October 25, 2011, the Court granted Defendants' motion to certify for appeal the denial of their motion to dismiss, but denied Defendants' motion for a stay pending appeal.  Pursuant to the discovery orders entered by the Court of

Chancery and Magistrate Judge Falk, the parties began producing documents on a rolling basis beginning on October 28, 2011.

On October 28, 2011, Plaintiff filed a fully briefed preliminary injunction motion to enjoin the scheduled shareholder vote and to strike or modify certain deal protection provisions in the Merger Agreement, including the preclusive Termination Fee. On October 27, 2011, the Court of Chancery entered a Stipulated Order of Case Management and set forth a schedule for discovery, briefing, and a preliminary injunction hearing on December 6, 2011, in the Delaware Action.

On October 31, 2011, Express Scripts filed with the Third Circuit a petition for leave to appeal, a motion for a stay pending appeal, and a motion for expedited treatment of its appeal.   Medco joined these applications.   The Third Circuit directed that Plaintiff file opposition papers by Friday, November 4 and that Express Scripts file reply papers by Monday, November 7.

While those papers were being briefed, counsel for the parties negotiated and memorialized the Settlement, which was approved by both Express Scripts and Medco's boards of directors on Tuesday, November 8, 2011.   The Court preliminarily approved the Settlement on November 28, 2011.  Since that time, the parties have attempted (unsuccessfully to date) to negotiate an agreed upon attorneys' fee and expense reimbursement award.

## III.   FACTUAL BACKGROUND

### A.   Scandal At Medco Leads To Several Lost Customer Contracts

Medco is a pharmaceutical benefits provider.  A material part of its business is managing the pharmaceutical needs of large institutions and health insurance plans.  In March 2011, a report by Steptoe & Johnson LLP, outside counsel to one of the largest health benefits providers in the world, California Public Employees Retirement System's ("CalPERS"), revealed that Medco had paid a former CalPERS' board member $4 million to help secure for Medco a contract with CalPERS.  Following the disturbing revelation of this apparent act of bribery, (i) CalPERS dropped Medco from the list of potential candidates to administer prescription drug benefits for the fund's members; and (ii) Medco has been subjected to several lawsuits and government investigations relating to these alleged improprieties.

Just before and following disclosure of the CalPERS scandal, Medco lost several significant contracts. In January 2011, MemberHealth, LLC provided the Company with notice that it would be terminating its Medicare Part D prescription benefits management agreement with Medco at the end of 2011.  On May 27, 2011, Medco announced that the Blue Cross Blue Shield Association planned to transition its mail order and specialty pharmacy benefit coverage for the Federal Employee Program to an alternate provider, effective January 1, 2012.  On July 21,

- 8 -

2011, Medco revealed that UnitedHealthcare had declined to renew a contract worth roughly $11 billion. Additionally, Medco received a subpoena from the U.S. Department of Justice requesting documents related to the Company's relationship with drug-maker AstraZeneca PLC.

Despite these developments, Medco's financial performance had remained remarkably stable. In fact, Medco had churned out record revenues during the most recent quarters. However, the burgeoning scandals threaten the continued tenure with the Company of Medco's Chief Executive Officer ("CEO"), and likely a broader swath of its senior management.

**B.     The Board "Threw In The Towel" And Hastily Entered The Proposed Transaction**

On July 21, 2011, the same day Medco announced the loss of the UnitedHealthcare contract, Express Scripts and Medco announced that the companies had entered into a "Merger Agreement" whereby Express Scripts would acquire its smaller rival. In a conference call shortly thereafter, Medco admitted that losing the UnitedHealthcare contract was a factor in agreeing to a deal with Express Scripts, but insisted that the negotiations "were on completely independent tracks and came to their own independent conclusion."

Pursuant to the Merger Agreement, Express Scripts agreed to pay $28.80 in cash and 0.81 of an Express Scripts share for each Medco share, valuing the Company at $71.36 per share at the time of the announcement. Despite the size

and regulatory complexities of the Proposed Transaction, the deal was thrown together in less than one month.  Plaintiff alleged that the expedited construction of the Proposed Transaction effectively eliminated the likelihood of any solicitation of interest from other possible strategic partners.

While Express Scripts and Medco touted the Proposed Transaction as a significant benefit to Medco's shareholders, Plaintiff alleged that Express Scripts had effectively tied Medco's hands against considering a better offer or even changing its recommendation to shareholders on the Proposed Transaction. Among the "deal protection" terms of the Merger Agreement was a shockingly high **$950 million Termination Fee**, which was payable by Medco if, among other situations, the Board terminated the Merger Agreement to accept a superior bid. The Termination Fee was also "single-trigger" meaning that it was payable if the Medco Board simply decided to change its recommendation on the Proposed Transaction, even in the absence of a competing bid.

Plaintiff further asserted that the Medco Board failed to negotiate for a "Go-Shop" provision in the Merger Agreement.  In light of the Board's failure to conduct a legitimate pre-signing market check, a "Go-Shop" was the only real way to ensure that shareholders received the highest value reasonably available for their shares.  While not a perfect substitute for a pre-signing auction, a "Go-Shop" could have served a similar function by allowing the Medco Board to canvas the market

to determine whether potential suitors were interested in making a competing bid. Instead of negotiating for a "Go-Shop," the Medco Board agreed to a prohibitive "No Solicitation" clause (the "No-Shop"), further limiting the Board's ability to entertain superior strategic alternatives.

Finally, the Medco Board also granted Express Scripts a "Matching Right" in the Merger Agreement that provided Express Scripts six business days to revise its proposal or persuade the Medco Board not to change its recommendation on the merger in the face of a proposal from a third party suitor. The Matching Right was intended to dissuade interested parties from making an offer for the Company by providing Express Scripts the opportunity to make repeated matching bids to counter any competing offers. Due to the complete absence of any pre-signing market check, Plaintiff alleged that no justification existed for the inclusion of the Matching Right and other bid advantages in the Merger Agreement.

Plaintiff asserted that the agreement to the No-Shop, Matching Right and Termination Fee (collectively, the "Deal Protections") as originally agreed to by the Medco Board served to deter competing parties from making bids and prevented the Medco Board from properly exercising its fiduciary duties to obtain the best available strategic alternative for Medco's shareholders, particularly because Medco's Board negotiated exclusively with Express Scripts.

## IV.   **ARGUMENT**

Rule 23(h) states, in relevant part, that "[i]n a certified class action, the court may award reasonable attorneys' fees and nontaxable costs that are authorized by law or by the parties' agreement." District courts are granted great deference in "determining whether a request for attorneys' fees should be granted." So long as they "clearly articulate the reasons to support [their] conclusion[s]." *In re Ins. Brokerage Antitrust Litig.*, MDL-No. 1663, 2009 WL 411856, at *3 (D.N.J. Feb. 17, 2009) *citing In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 301 (3d Cir. 2005). Plaintiff seeks an award of attorneys' fees and expenses for Class Counsel in the amount of $18 million, plus reimbursement of expenses. Plaintiff's fee application is fair and reasonable in light of the very substantial benefits Class Counsel achieved for Medco's shareholders through the prosecution of the Action and the resulting Settlement.

## A.    A Fee Is Warranted Under The Common Benefit Doctrine

Where the Class was benefitted by the loosening of the preclusive deal protections and additional disclosures, an award of attorneys' fees is warranted under the "common benefit doctrine," which recognizes Class Counsel's efforts in litigating a case that results in "a substantial benefit on members of an ascertainable class." *In re Diet Drugs Prods. Liab.*, 582 F.3d 524, 546 (3d Cir. 2009) (citation and internal quotations omitted). Importantly, under this doctrine, "[a]ttorney's fees are awardable even though the benefit conferred is purely

- 12 -

*nonpecuniary* in nature." *Merola v. Atlantic Richfield Co.*, 515 F.2d 165, 169-70 (3d Cir. 1975) (emphasis added) (citing *Mills v. Elec. Auto-Lite*, 396 U.S. 375 (1970)).   In determining whether to apply the common benefit doctrine, courts consider whether a substantial benefit was achieved for an ascertainable class, and also measure the proportional spread of the requested attorneys' fees across the class.   *In re Schering-Plough/Merck Merger Litig.*, No. 09-cv-1099, 2010 WL 1257722, at *15 (D.N.J. Mar. 26, 2010).   Courts also examine whether "(1) the benefits may be traced with some accuracy; (2) whether the class of beneficiaries are readily identifiable; and (3) whether there is a reasonable basis for confidence that the costs may be shifted with some precision to those benefitting." *Polonski v. Trump Taj Mahal Assocs.*, 137 F.3d 139, 145 (3d Cir. 1998).

## 1.   A Common Benefit Was Achieved For A Readily Ascertainable Class

In order to determine whether a benefit was conferred upon the Medco shareholders – and also to ascribe a value to that benefit – it is appropriate to look to Delaware state law for guidance because Delaware law governs the substantive elements of this case and the rights of the shareholders.

There is no doubt that the modifications to the Merger Agreement provided a substantial benefit to Medco's shareholders under guiding Delaware law.   In *In re Compellent Technologies, Inc. Shareholder Litigation*, No. 6084, 2011 WL 6382523 (Del. Ch. Dec. 9, 2011), Vice Chancellor Laster of the Delaware

Chancery Court explained that the "benefit generated from modifying deal protections" stem from the "increased opportunity for stockholders to receive greater value." *Id.* at *19. *See also Tandycrafts, Inc. v. Initio Partners,* 562 A.2d 1162, 1165 (Del. 1989); *State of Wisc. Inv. Bd. v. Bartlett,* No. 17727, 2002 WL 568417, at *5 (Del. Ch. Apr. 9, 2002)(finding that a therapeutic benefit was created by supplemental disclosures and determining the reasonable fee for that benefit).

Vice Chancellor Laster noted that in order for the court to quantify that "increased opportunity for stockholders to receive greater value," it must apply its "own 'sound business judgment' when setting a fee award" and "evaluating changes to deal protections necessarily involves healthy measures of discretion, but assessing a non-monetary benefit always does." *Id*. at *21 (the court focused on the "value of the changes [to the deal protections] to Compellent's shareholders" in determining reasonable attorneys' fees). As that court further explained (at *20):

> The incremental value that stockholders receive includes both ***the direct benefit from a reduction in the termination fee*** or other hard costs, as well the additional, more contingent and causally attenuated value from price increases generated by the topping bid and further bidding. ***The probability of receiving a higher bid must take into account that reducing the barriers makes a bid marginally more likely***. The calculation consequently depends on the increased likelihood of a topping bid under the revised defensive measures. Because more extreme defensive measures should have a more powerful dampening effect, ***settlements that ameliorate stronger forms of deal protections should warrant larger fees***. [Emphasis supplied].
> The court in *Compellent* also confirmed that whether a topping bid actually

- 14 -

emerges is irrelevant when determining the amount of the benefit achieved through modifications to deal protections.  As that court recognized, "[t]he principal benefit conferred by the settlement was therefore to increase the *likelihood* of a topping bid." *Id.* at *1 (emphasis added).  The Court explained further that "the size of the benefit is not affected by whether or not a topping bid actually emerges" because "[a]ssessing the benefits of the settlement as of the time it was agreed to, rather than in light of after-the-fact events knowable only through hindsight, comports with how Delaware courts evaluate decisions made by fiduciaries." *Id.* at *20.  Such is the case here – the attorneys' fees analysis does not rely on whether a topping bidder for Medco actually emerged.

There is no question that the benefits to the Class achieved through this litigation warrant an award of attorneys' fees under *Compellent.*  Without intervention by Plaintiffs, consummation of the Merger Agreement was a near *fait accompli.  See* Subramanian Decl. ¶¶17, 22.  As drafted, the Merger Agreement effectively precluded the Medco Board from considering a better offer, or changing its recommendation with regard to the Proposed Transaction.  Attacking these preclusive "deal protection" terms was Plaintiff's primary goal when instituting this litigation, and the result of the Settlement is significantly weakened deal protective devices, which greatly increased the chances of a topping bid.

The nature of this relief negotiated by Plaintiff was particularly important

here (and thereby particularly valuable to Medco's shareholders), because Medco negotiated exclusively with Express Scripts and performed no market check prior to the consummation of the Merger Agreement.  *See* Subramanian Decl. ¶¶15-16. Accordingly, these modifications to the deal protection terms made it more likely that Medco's shareholders were receiving the highest price reasonably available. As the court recognized in *Compellent*, whether the board reaches out to other potential bidders prior to executing a merger agreement affects the likelihood of another bidder arising after modification to the deal protection terms of that agreement.  The board in *Compellent* had reached out to potential bidders prior to executing the merger agreement, therefore making it less likely that a topping bid would arise in the wake of the modifications to the deal protection terms.  That is not the case here, further evidencing the value of the modifications to the deal protection terms provided by the Settlement.

### a)     Termination Fee

Among the deal protection terms of the Merger Agreement was a shockingly high $950 million Termination Fee, which was payable by Medco if, among other situations, the Board terminated the Merger Agreement to accept a superior bid. *See* Taylor Dec. Ex. CC, Merger Agreement, Section 7.3(e).  The Termination Fee was also payable if the Medco Board simply decided to change its recommendation on the Proposed Transaction, even in the absence of a competing

- 16 -

bid.  Thus, a change of recommendation, even if the in the best interest of the
Company, was virtually barred by the prospect of an immediate $1 billion cash
divestiture.  By agreeing to the punitive $950 million Termination Fee, the Medco
Board significantly reduced the possibility of maximizing shareholder value.
Subramanian Decl. ¶¶18-20.  Most notably, the Settlement requires a reduction in
the Termination Fee by an unprecedented $300 million. Unless Medco were to
terminate the Agreement without a competing bid, the Termination Fee was
reduced from $950 million to $650 million, therein bringing the termination fee
below a level that otherwise would have dissuaded even the most aggressive third
party bidders from pursuing a deal for Medco.  Subramanian Decl. ¶¶18-20, 24.

<b>b)</b>     <u><b>Matching Rights</b></u>

Similarly, the Medco Board granted Express Scripts a "Matching Right" that
provided Express Scripts with six business days to revise its proposal or persuade
the Medco Board not to change its recommendation on the Merger Agreement in
the face of a proposal from a third party suitor. *See* Taylor Dec. Ex. CC, Merger
Agreement, Section 5.4(b).  Additional third-party bids would trigger a three-day
match right.  *Id.*  The matching right meant that Express Scripts would always have
the final look at any third-party bid.  Just like the Termination Fee, the Matching
Right dissuaded interested parties from making an offer for Medco by providing
Express Scripts the opportunity to make repeated matching bids to counter any

competing offers. *See* Subramanian Decl. ¶¶21-22. Due to the complete absence of any pre-signing market check, no justification existed for the inclusion of the Termination Fee, Matching Right and the other bid advantages in the Merger Agreement.

The Settlement provides for modifications to the Matching Right to allow Express Scripts only one opportunity, rather than unlimited opportunities, to match a competing bid. The modification limiting Express Scripts to a one-time matching right, relieved concern by potential topping bidders that a bidding war would ensue and further increased the likelihood that a determined third party bidder would have a path to success. *Id.* at ¶25.

### c)   <u>Additional Disclosures</u>

The Settlement further provides that Express Scripts and Medco would include additional disclosures in the final proxy statement that was filed on November 18, 2011 and distributed to both companies' shareholders in soliciting approval of the Proposed Transaction. In common benefit cases, "a heightened level of corporate disclosure, if attributable to the filing of a meritorious suit, may justify an award of counsel fees." *Tandycrafts*, 562 A.2d at 1165; *Eisenberg v. Chicago Milwaukee Corp.,* No. 9374, 1988 WL 112910, at *3 (Del. Ch. Oct. 25, 1988) ("Where a representative shareholder succeeds in correcting invalid disclosures in connection with a transaction between the corporation and its

stockholders, our case law recognizes that for fee awarding purposes, the corporation and all of its shareholders are benefitted.")(citations omitted).

The Settlement resulted in numerous additional or amended disclosures in the Proxy Statement which allowed Medco's shareholders to make a decision on whether to vote to approve the Transaction based upon a full and complete understanding of the relevant facts.   ***First***, the Settlement resulted in additional disclosures to the discussion of the Board's analysis and consideration of whether to agree to the Proposed Transaction including:

- The fact that Medco analyzed potential business combinations with CVS Caremark and United Healthcare;

- Medco's management's efforts to keep the Medco board and M&A committee apprised of negotiations between United Healthcare and Medco to renew various strategic agreements between the two companies, and furthermore, that discussions with United Healthcare took place prior to execution of the merger agreement;

- The fact that Medco management believed a merger with Express Scripts would produce higher benefits to Medco, including $1 billion in annual synergies, than any other potential combination or a plan for Medco to remain a standalone company;

- The reasons supporting Express Scripts' views with respect to the valuation of Medco and appropriate consideration to be paid to Medco shareholders;

- Medco's and Express Scripts' views on the possibility of premiums to the current market price of Medco's common stock;

- Various financial metrics considered by the Medco board;

- The fact that Express Scripts retained a second financial advisor because of the size of the transaction;

- The fact that Express Scripts' management believed that Express Scripts

would require a second lead financing source given the amount of financing required;

- The fact that the United Healthcare negotiations were discussed at a July 15, 2011 Medco board meeting;

- The fact that, over the course of the negotiations, the Medco board and senior management considered various factors to determine whether the mix of consideration – 60% stock and 40% cash – was appropriate; and

- The fact that there were no discussions between Medco and Express Scripts regarding which of Medco's directors would be considered for the board of directors at Express Scripts following the merger and no discussion concerning future employment of executive officers prior to the execution of the merger.

*Second*, the Settlement Agreement secured the following additional details concerning the financial analyses that were performed by J.P. Morgan in arriving at the conclusion that Express Scripts was fairly compensating Medco shareholders:

- The fact that unlevered after-tax cash flows treated stock-based compensation as a cash expense;

- Clarifications concerning how the pro forma combined company implied equity value per share was calculated;

- The expected payments to J.P. Morgan, which were calculated based on a percentage of the value of the transaction; and

- The aggregate compensation received by J.P. Morgan and its affiliates from Express Scripts during the prior two years.

*Third*, the Settlement Agreement secured the following additional details concerning the financial analyses that were performed by Lazard in arriving at the conclusion that Express Scripts was fairly compensating Medco shareholders:

- The fact that Lazard's discounted cash flow analysis treated stock-based

- 20 -

compensation as a cash expense;

- The enterprise values and EBITDA multiples of the comparable transactions selected by Lazard;

- Lazard's estimates of the values of the synergies to be realized from the mergers for 2012, 2013 and 2014;

- The fact that Lazard had received compensation from Medco in connection with a 2010 acquisition of United Biosource; and

- The expected payments to Lazard, which were calculated based on a percentage of the value of the transaction.

*Fourth*, the Settlement Agreement secured the following additional details concerning the financial analyses that were performed by Credit Suisse in arriving at the conclusion that Express Scripts was fairly compensating Medco shareholders:

- The dates of announcements for the comparable transactions selected by Credit Suisse and

- EBITDA multiples for the selected comparable transactions.

*Fifth*, the Settlement Agreement secured the following additional details concerning the financial analyses that were performed by Citigroup in arriving at the conclusion that Express Scripts was fairly compensating Medco shareholders:

- The Firm Value/Standalone Target LTM EBTIDA values for the comparable transactions selected by Citigroup;

- The value of the aggregate fees Citigroup and its affiliates received from Express Scripts since January 1, 2010; and

- The fact that Express Scripts' forecasts were prepared with the assumption that its contract would Walgreens would continue, but that Express Scripts did not believe that termination of that contract would be material.

- 21 -

Material supplemental and corrective disclosures by themselves can merit the award of a substantial fee.  *See*, *e.g.*, *In Schering-Plough/Merck*, 2010 WL 1257722, at *18 (awarding $3.5 million in fees and expenses in connection with settlement that provided additional disclosures relating to $41.1 billion merger between Schering-Plough Corporation and Merck & Co., Inc.); *In re The DirecTV Group, Inc. S'holder Litig*, No. 4581 (Del. Ch. Nov. 30, 2009) (Order) (awarding $7 million in attorneys' fees in a mainly-disclosure settlement concerning the $14.6 billion merger of DirecTV Group, Inc. and Liberty Media Entertainment Incorporated)(Taylor Dec. Ex. EE); *Minneapolis Firefighters Relief Assoc. v. Ceridian Corp.*, No. 29660 (Del. Ch. Mar. 24, 2008) (Order) ($7 million fee awarded in mainly-disclosure settlement concerning $5.3 billion merger)(Taylor Dec. Ex. GG); *In re Elec. Data Sys. Class Action Litig.,* No. 366-01078-2008 (Tex. Dist. Ct. Dec. 23, 2009) (Order) ($3.25 million fee awarded in disclosure-only settlement concerning $13 billion merger) Taylor Dec. Ex. DD; *In re Mony Group Inc. S'holders Litig.*, No. 20554 (Del. Ch. Oct. 2. 2004) (Order) ($2.7 million fee awarded in disclosure-only settlement concerning $1.5 billion merger) (Taylor Dec. Ex. FF).

### d)      <u>Postponement Of Shareholder Vote</u>

Finally, Express Scripts and Medco agreed to postpone a shareholder vote by at least five days, to no earlier than December 21, 2011.

**2.  The Additional Factors For The Applicability Of The
Common Benefit Doctrine Are Satisfied**

There is a "readily ascertainable class" of Medco shareholders who benefitted from the changes to the merger terms and additional disclosures outlined above. The "ascertainable class consists of the corporation's shareholders." *Schering-Plough/Merck*, 2010 WL 1257722, at *16.

Finally, the benefits outlined above can be traced directly to Plaintiff's and Class Counsel's prosecution of the Action and the resulting Settlement. The "benefit conferred may be accurately traced by comparing the original" terms of the deal and the original disclosures given to shareholders to the supplemental terms and disclosures. *Id.* at *16. Here, it is easy to trace the benefits conferred by comparing the original terms of the deal, which included a $950 million termination fee, to the ultimate terms of the deal, which slashed that termination fee to $650 million. And, the Settlement provides for modifications to the Matching Right to allow Express Scripts only one opportunity, rather than unlimited opportunities, to match a competing bid. Furthermore, the additional disclosures may be accurately traced by comparing the subsequent proxy statement to the original. *Id.* These benefits will inure to "readily identifiable beneficiaries," who are the class members, the shareholders of Medco. *See* Ex. CC, Merger Agreement Section 1(i).

**B.    The Court Should Use The Percentage-Of-Recovery
Method To Assess The Reasonableness Of The Fee**

Having established that an award of fees is appropriate under the common

benefit doctrine, the court must next determine how to calculate a reasonable fee

award, deciding between the "percentage-of-recovery" method or the lodestar

method.  It has been noted that "[e]ach has distinct attributes suiting it to particular

types of cases."  *In re Ins. Brokerage Antitrust Litig.*, No. 04-cv-5184, 2009 WL

411856, at *4 (D.N.J. Feb. 17, 2009) *citing Varacallo v. Massachusetts Mut. Life

Ins. Co.*, 226 F.R.D. 207, 249 (D.N.J. 2005).   In particular, the percentage-of-

recovery method is used in instances where a class benefits from a common fund

or benefit because otherwise "class members would be unjustly enriched if they

did not adequately compensate counsel responsible for generating the fund."  *In re

Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 300 (3d Cir. 2005); *In re Ins. Brokerage

Antitrust Litig.,* No. 09-5184, 2009 WL 411856, at *4 (D.N.J. Feb. 17, 2009).  In

addition, the percentage-of-recovery method "rewards counsel for success and

penalizes counsel for waste or failure."  *Serrano v. Sterling Testing Sys., Inc.*, 711

F. Supp. 2d 402, 418 (E.D. Pa. 2010).  In contrast, the lodestar method is more

commonly used when fees are awarded pursuant to a fee-shifting statute, where the

fees are paid by defendants, contrary to the traditional "American Rule" where

parties bear their own expenses.  *Id.*[3]

Importantly, the benefit need not be monetary in order to be quantifiable and for the court to assess a fee award on a percent-of-recovery basis.  In *Dewey v. Volkswagen of Am.,* 728 F. Supp. 2d 546, 561 (D.N.J. 2010), for example, the parties agreed to a settlement which included "educational preventative maintenance information" for all class members, who were Volkswagen car purchasers.  The court assessed the fee award by using the "percentage-of-recovery" method, and used an expert's valuation of the "educational preventative maintenance information," to quantify the value of that portion of the settlement, adjusting for certain errors in the expert's analysis.  *Id.* at 595-97.  Similarly, in *In re LG/Zenith Rear Projection Television Class Litigation*, No. 06-cv-5609, 2009 WL 455513, at *9 (D.N.J. Feb. 18, 2009), the settlement involved an extension of

---

[3]  Where an award of fees is warranted, but where the benefits provided through litigation are unquantifiable, courts often will award fees based on the counsel's lodestar in prosecuting the case.  *See, e.g., Schering-Plough/Merck*, 2010 WL 1257722 at *17; *In re Mercedes-Benz Tele Aid Contract Litig.*, MDL No. 1914, 07-cv-2720, 2011 WL 4020862, at *7 (D.N.J. Sept. 9, 2011) (using the lodestar-multiplier method where the "dollar value of the settlement . . . is too uncertain"). However, where the benefit is quantifiable, the percentage-of-recovery is preferred over the lodestar method in such instances.  For example, where there is a common fund, courts generally apply the percentage of the recovery method in determining an appropriate award of fees.  *Rite Aid Sec. Litig.*, 396 F.3d at 300; *In re Genta Sec. Litig.*, No. 04-cv-2123, 2008 WL 2229843, at *7 (D.N.J. May 28, 2008) ("The percentage-of-recovery method is generally favored in common fund cases. . . ."); *Serrano*, 711 F. Supp. 2d at 418; *Larson v. Sprint Nextel Corp.*, No. 07-cv-5325, 2010 WL 234934, at *18 (D.N.J. Jan. 15, 2010) ("[T]he percentage of recovery method is viewed as best approximating a contingent fee award in a common fund

warranties on television sets.  Class counsel argued that "a conservative valuation of the warranty valuation would be $450, and aver that the class consists of more than 60,000 individuals." *Id.*  Based upon those estimations, the court determined that a requested fee representing 5.7% of the value of the warranties was reasonable, particularly where applying more conservative numbers, the percentage would still be reasonable.  *Id.*[4]

Benefits achieved by negotiating less restrictive deal lock-up provisions are quantifiable.  Noting that "[m]odifications to ... defensive measures can be" quantified, Vice Chancellor Laster opined that "[l]oosening a no-shop cause, weakening information rights or matching rights, and ameliorating restrictions on a board changing its recommendation should, all else equal, increase the chance of a topping bid.  The resulting benefits can be estimated as a function of the incremental amount that stockholders would receive if a higher bid emerged times the probability of the higher bid."  *Compellent*, 2011 WL 6382523, at *20.

Although non-monetary, the benefits achieved through the Settlement are readily quantifiable under applicable Delaware law.  As detailed in the accompanying Declaration of Professor Subramanian, the Settlement provided significant value to Medco's shareholders based upon the following relevant

---

recovery.").

[4] *Cf. In re Computron Software, Inc. Sec. Litig.*, 6 F. Supp. 2d 313, 323 (D.N.J. 1998) ("At the very least, the district court ... needs to make some reasonable

factors:  (1) the increased likelihood of a topping bid in light of the modifications to the deal protections; and (2) the expected markup of a topping bid.  *See* Subramanian Decl. ¶¶26-27.   Based on Vice Chancellor Laster's analysis in *Compellent*, Professor Subramanian explains that the benefit to Medco's shareholders can be quantified through application of the following formula:

Benefit Conferred = ((Likelihood of Higher Bidder) x ($ Reduction in Termination Fee)) + (Original Deal Value) x (Incremental Likelihood of Higher Bidder) x (Expected Markup)

Professor Subramanian explains:  "The first term captures the benefit that shareholders receive from the simple fact that, in the event of a higher bid, value that would have gone to the first bidder in the form of the termination fee now goes to the target shareholders.  The second term captures the benefit that shareholders receive from the markup over the original deal price, either through greater value from the second bidder (if the second bidder is successful) or through a higher bid from the initial bidder."  Subramanian Decl. ¶26.  Based on his analysis of the facts of this case and the terms of the Settlement, and comparing historical information regarding corporate mergers since 1988, and applying the formula described above, Professor Subramanian estimates the value of the Settlement to be in excess of $252 million, based on the mid-range of his analysis, and approximately $153.0 million using the very lowest range of his analysis.  Subramanian Decl. Ex. 3.

---

assessment of the settlement's value").

C.   **Plaintiff Seeks A Reasonable Fee Under The Percentage-Of-Recovery Doctrine**

Applying the most conservative valuation of the benefit achieved, Class Counsel's application for $18 million represents just 11.8% of the most conservative estimate of the common benefit, a figure which is patently reasonable considering all the relevant factors.

1.   **Class Counsel Seeks 11.8% Of The Common Benefit**

Under the original terms of the Merger Agreement, the size of the termination fee combined with the large size of the deal and the six-day matching right made the likelihood of a topping bid emerging for Medco negligible.  *See* Subramanian Decl. ¶¶17, 30.  Indeed, there is little evidence that any deal "larger than $10 billion in value with a termination fee of this magnitude that has been jumped."  *Id.* at ¶¶30, 35.  Conversely, after the modifications of the deal protection terms, Medco's shareholders enjoyed an incremental increase in the likelihood of a topping bid emerging.  *Id.* at ¶45.  As described by Professor Subramanian,[5] this increased likelihood of a higher bid emerging in light of the Settlement reflects the general historical probabilities of third-party bidders emerging as well as the pertinent aspects of the Proposed Transaction challenged by Plaintiff in particular.  *Id.* at ¶¶30-44.  Considering all of these factors, a

_____

[5] There is precedent for a court to consider an expert's analysis of the value of the benefit conferred for non-monetary class benefits achieved in a settlement.  *See*

reasonable jump rate here is in the range of 5-9%. *Id.* at ¶45.

In addition to determining the likelihood of a topping bid emerging in light of the modifications provided in the Settlement, establishing the likely range of such a potential topping bid is also necessary. As the court in *Compellent* recognized, the lower bound in this analysis should be the initial termination fee "[b]ecause a target board would breach its fiduciary duties by approving a termination fee so large as to preclude any topping bid" and the "original transacting parties cannot reasonably dispute that a topping bidder should be willing to pay at least the value implied by the deal price plus the original termination fee." *Compellent,* 2011 WL 6382523 at *19; Subramanian Decl., at ¶46. A review of the studies cited by the *Compellent* court, and those referenced in Professor Subramanian's Declaration, shows that the average markup of a third-party bid is anywhere from 10.5-21.8 % above the original offer price. *See Compellent,* 2011 WL 6382523 at *24; Subramanian Decl. at ¶49. More precisely for the analysis here, the mean markup for deals above $10 billion is 12.7%. *See* Subramanian Decl. ¶49. Conservatively, therefore, the expected markup of a third party bidder for Medco would be 10-14% above the Express Scripts offer. *Id.* at ¶50.[6] The increased likelihood of a topping bid in light of the modifications to the

_____

*Dewey*, 728 F. Supp. 2d at 613.

[6] The *Compellent* court adopted an expected markup of 11.37%. 2011 WL 6382523, at *25.

deal protections is in the range of 5-9% and the expected markup of a topping bid would be anywhere from 10-14% above Express Scripts' offer.

A reasonable application of this analysis to the facts of this case and the attorneys' fees requested herein shows that an award of $18 million is warranted.[7] For example, applying the percentages adopted by the *Compellent* court (likelihood of a topping bid of 8%, average incremental value of a topping bid of 11.37% and attorney's fees allocation of 25%), would provide for an award of $68.76 million in attorney's fees here [($300,000,000 x 0.08) + ($27,600,000,000 x .1137)(.08)](0.25). Here, even under the most conservative of the percentages provided in Professor Subramanian's Declaration, *i.e* a 5% likelihood of a topping bid and an expected markup of only 10%, would almost always result in an award of attorney's fees greater than $18 million.

### 2. 11.8% Is A Reasonable Percentage Of The Benefit To Award To Class Counsel

In assessing fees under the percentage-of-recovery method, courts weigh a variety of factors including the benefit of the settlement to the class, any objections to the settlement or fees requested; the skill and efficiency of the attorneys involved; the complexity and duration of the litigation; the risk of non-payment; the amount of time devoted by Class Counsel to the litigation; and fee awards in similar cases. *Briggs v. Hartford Fin. Servs. Group, Inc.*, No. 7-cv-5190, 2009 WL

2370061, at *14 (E.D. Pa. July 31, 2009) (citing *Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 195 n.1 (3d Cir. 2000)).

As already discussed herein and detailed in the Subramanian Declaration, the benefits achieved through this proposed Settlement are significant and warrant the award of a commensurate fee.  Notably, Vice Chancellor Laster reasoned that "[b]ecause more extreme defensive measures should have a more powerful dampening effect, settlements that ameliorate strong forms of deal protection should warrant larger fees." *Compellent*, 2011 WL 6382523, at *20.  This Court should thus place great weight in Class Counsel's ability to negotiate a $300 million reduction in the $950 million fee, an extremely preclusive deal protection device, in assessing the reasonableness of the requested fee.  Having established herein and in the Subramanian Declaration the tremendous benefit of the Settlement to the Class, we turn to the additional factors considered by the Third Circuit in assessing reasonableness of a fee.

a)   <u>**Complexity Of Litigation**</u>

The novelty and complexity of the issues presented in this action created a meaningful risk that Plaintiff would not prevail, and that Class Counsel – who accepted this case on a fully contingent fee basis – would not recover their expenses or the value of their time.  Courts generally recognize that where, as here,

---

[7] With 404,456,685 shares outstanding, this equals $0.045 per Medco share.

counsel's compensation is contingent on recovery, a premium over counsel's hourly rate is appropriate. *See, e.g., First State Orthopaedics v. Concentra, Inc.*, 534 F. Supp. 2d 500, 523 (E.D. Pa. 2007) (approving a substantial fee award where there were "complex legal and factual issues and procedural difficulties of [a] nationwide class"); *In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231, 261 (D. Del. 2002) (awarding fee of 22.5% of settlement value where there were "complex legal and factual issues and procedural difficulties of this nationwide class action and related state cases"). This was not a standard, cookie-cutter deal litigation. Instead, it involved a complex deal structure that centered on an unprecedented $950 million termination fee approved by the Board, which had not reached out to any other potential suitors prior to agreeing to the offer by Express Scripts.

The central focus of the litigation – the $950 million termination fee – presented unique issues of Delaware law, and Plaintiff was, by no means, assured that Defendants would capitulate. Termination fees "are not unusual the corporate sale or merger contexts. They are used to reimburse the prospective buyer for expenditures in pursuing the transaction and also for lost opportunities." *Kysor Indus. Corp. v. Margauz, Inc.*, 674 A.2d 889, 897 (Del. Super. Ct. 1996). Nevertheless, there is a point at which the amount of a termination fee can become so excessive that it exceeds the bounds of reasonableness and serves no purpose but to freeze out any potential competitive bids. *See Phelps Dodge Corp. v.*

*Cyprus Amaz Minerals Co.*, No. 17398, 1999 WL 1054255, at *2 (Del. Ch. Sept. 27, 1999) (stating that the termination fee at issue "certainly seems to stretch the definition of range of reasonableness and probably stretches the definition beyond its breaking point."). In challenging the $950 million termination fee here, Plaintiff argued that the unique circumstances of this case rendered the termination fee unreasonable as a matter of law. For example, Plaintiff pointed out that the termination fee had a "single trigger," which would give rise to a payment obligation if the Medco Board simply changed its mind regarding the recommendation that shareholders support the Acquisition. Further, Plaintiffs demonstrated that a $950 million payment would equal 70% of Medco's 2010 net earnings, presenting the Company's shareholders with a classic Hobson's choice of accepting a merger at the offered terms, or forfeiting 70% of the Company's 2010 earnings to a significant competitor. Finally, by approaching $1 billion, the termination fee at issue here approached a range that had been criticized (albeit not rejected outright) by Delaware courts. *See In re Toys "R" Us Inc. S'holder Litig.*, 877 A.2d 975, 1021-23 (Del. Ch. 2005) (courts should consider "the preclusive differences between termination fees starting with a 'b' rather than an 'm.'").

Nevertheless, Plaintiff's ability to prevail was far from certain. As Defendants pointed out, "standstill" agreements, "matching rights," "no-shop" provisions, and termination fees are among the sort of deal protections that have

- 33 -

been approved by Delaware courts. *See In re Smurfit-Stone Container Corp. S'holder Litig*, No. 6164-VCP, 2011 WL 2028076, at *21 n. 141 (Del. Ch. May 20, revised May 24, 2011) (acknowledging that such terms "are customary in public company mergers today").  The fact that Plaintiff was able to extract Defendants' agreement to significantly modify the terms of the Merger Agreement through the Settlement, therefore, speaks to the strength of Plaintiff's claims and the importance of the changes negotiated here.  In short, Plaintiff's claims presented complex and novel issues of law with serious ramifications to the rights and expectations of Medco's shareholders.

**b)    Contingent Nature Of Litigation**

"A reasonable percentage award must compensate the contingent risks borne by counsel so as to ensure that 'competent counsel continue to be willing to undertake risky, complex, and novel litigation.'"); *Warfarin Sodium*, 212 F.R.D. at 261, *citing Manual for Complex Litigation 3d*, § 24.121, at 191.  Here, despite the complexity of the issues presented in this action Class Counsel accepted this case on a fully contingent fee basis, creating a significant risk that they would not recover their expenses or the value of their time.  Courts generally recognize that where, as here, counsel's compensation is contingent on recovery, a premium over counsel's hourly rate is appropriate. *See Briggs*, 2009 WL 2370061, at *15 (recognizing that where Plaintiff's counsel proceeded "on a contingent fee

- 34 -

agreement" and "risked nonpayment due to the nature of the case and the inherent risk in losing" a substantial fee was warranted); *Gunter v. Ridgewood Energy Corp*, 223 F.2d 199, 199 (3d Cir. 2000)("[T]he risk that counsel takes in prosecuting a client's case should also be considered when assessing a fee award."); *In re Computron Software Sec. Litig.*, 6 F. Supp. 2d 313, 323 (D.N.J. 1998) (noting the "significant attendant risks of proceeding with the instant litigation" in light of the "complexity of the issues" and awarding fee of 25% of amount of recovery); *Wafarin Sodium*, 212 F.R.D. at 216 (awarding substantial fee where class counsel "faced considerable contingent risk in pursuing this litigation).

c)   <u>**Stage Of Proceedings**</u>

Courts also look to the stage at the amount of time spent by Class Counsel and the stage at which the litigation settled and award a greater percentage of the benefit the further a case has progressed:

> When a case settles early, this Court tends to award 10-15% of the monetary benefit conferred... When a case settles after the plaintiffs have engaged in meaningful litigation efforts, typically including multiple depositions and some level of motion practice, fee awards range from 15-25% of the monetary benefits conferred. . . [H]igher percentages are warranted when cases progress further or go the distance to a port-trial adjudication.

*Compellent,* 2011 WL 6382523 at *25, *citing In re Emerson Radio S'holder Deriv. Litig.,* No. 3392-VCL, 2011 WL 1135006, at *3 (Del. Ch. Mar. 28, 2011)(internal quotations omitted).  Here, Plaintiff has clearly engaged in meaningful litigation

- 35 -

efforts, including significant amounts of discovery (briefing, document production and depositions) as well as briefing motions for preliminary injunction, motions to dismiss, motions to stay and appeals to the Third Circuit. Plaintiff also briefed and filed its Motion for Class Certification. And all of this occurred on an expedited basis, further revealing the immense litigation efforts of Plaintiff's counsel in their struggle to obtain the most favorable settlement possible on behalf of the Class, as reflected in the Settlement Agreement.

In addition, Class Counsel have expended a total amount of 5,726.75 hours in litigating this case. Attached as exhibits to the accompanying Declaration of Lindsey Taylor are individual affidavits from each of the firms involved in this Action and the Delaware Action. Taylor Dec., Exs. D through BB. These individual affidavits attest to the hours, billing rates, work performed by, and expenses of each firm. As detailed in these affidavits, plaintiffs' counsel devoted significant time and resources to investigating the case, preparing discovery, responding to Defendants' extensive motion practice, preparing injunction papers, and reviewing documents produced by Medco and Express Scripts. In addition, plaintiffs' counsel deposed Ravi Sachdev, a managing director at J.P. Morgan who played an instrumental role in structuring the transaction, and Richard Rubino, the Chief Financial Officer of Medco, who testified regarding the history of and Medco's reasons for entering into the transaction with Express Scripts. Awards of

much higher percentages have been granted to cases where counsel expended fewer hours than here. *In re Safety Components Sec. Litig.*, 166 F. Supp. 2d 72, 100-101 (D.N.J. 2001) (awarding 25% of settlement benefit to counsel who devoted only 1,508 hours over a 22-month period); *Briggs*, 2009 WL 2370061, at *15-16 (awarding 30% fee where counsel spent no more than 850 hours litigating the case). Accordingly, a fee award equal to 11.8% of the benefit conferred is appropriate here.

### d)      Competency Of Counsel

Finally, the standing of Plaintiff's counsel is well known to this Court, as is the standing of Defense counsel. It was only through the perseverance and skill of Plaintiff's counsel that the Class realized such substantial benefits. The quality of Class Counsel is also measured by the benefit achieved for the Class, which as noted above was substantial. *See In re Cendant Deriv. Litig.*, 232 F. Supp. 2d 327, 338 (D.N.J. 2002)(noting that the "single clearest factor reflecting the quality of counsel's services is the result obtained"); *see also Cullen v. Whitman Med. Corp.*, 197 F.R.D. 136, 149 (E.D. Pa. 2000); *Warfarin Sodium*, 212 F.R.D. at 261("The class counsel ... showed their effectiveness in the case at bar through the favorable cash settlement they were able to obtain.")

### e)      Precedent Supports The Fee Request Here

The fee requested is 11.8% of a conservative estimate of the value of the

benefits provided through the Settlement.  This percentage is in accord fee awards in with other cases.  Indeed, courts typically award fees that comprise a much higher percentage of the value of the benefit to the fund.  In the Third Circuit, "[m]any courts have considered 25% to be the benchmark figure for attorney fee awards in class action lawsuits . . . and awards above this percentage amount are common." *First State Orthopaedics v. Concentra, Inc.*, 534 F. Supp. 2d 500, 523 (E.D. Pa. 2007); *Warfarin Sodium*, 212 F.R.D. at 261.  *See also In re Rite Aid Corp. Sec. Litig.*, 146 F. Supp. 2d 706, 735 (E.D. Pa. 2001) (reviewing 289 settlements which demonstrated an "average attorney's fees percentage [of] 31.71%, with a median value of "one-third"); *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 303 (3d Cir. 2005) (*affirming In re Rite Aid Corp. Sec. Litig.*, 146 F. Supp. 2d 706 and crediting three studies of class action settlements that found that awards from between 25-31% were "average" and "fairly standard"); *Safety Components Inc. Sec. Litig.*, 166 F. Supp. 2d at 101-02 (collecting cases with fees ranging up to $37 million, ranging from 27.5% to 33.8% of their respective settlement amounts); *First State Orthopaedics*, 534 F. Supp. 2d at 523-24 (characterizing a fee of 11.5% as "well below the norm" and citing cases with fees ranging from 21.25% to 33%).

### f)      Cross-Check With Lodestar Method

In order to determine whether fees requested under the percentage-of-

recovery method are reasonable, courts will often perform a cross-check under the lodestar method. *Dewey*, 728 F. Supp. 2d at 606. Under the lodestar method, "a district court in calculating the attorney fee to be awarded first determines the hours reasonably expended by counsel in successfully achieving the result sought by litigation and then multiplies those hours by a reasonable hourly rate for the attorney's services." *Joy Mfg. Corp. v. Pullman-Peabody Co.*, 742 F. Supp. 911, 912 (W.D. Pa. 1990). Once the lodestar amount is calculated, the court "may increase or decrease that amount by applying a lodestar multiplier," which "attempts to account for the contingent nature or risk involved in a particular case and the quality of the attorneys' work." *In re Diet Drugs*, 582 F.3d at 540 n.33. (citations omitted). In setting the lodestar amount, the court multiplies the number of hours reasonably worked on a client's case by a reasonable billing rate for such services in the given geographical area provided by a lawyer of comparable experience. *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 280 (3d Cir. 2009). The lodestar method is "strongly presumed to yield a reasonable fee." *Weber v. Gov't Emps. Inc. Co.*, 262 F.R.D. 431, 451 (D.N.J. 2009)(citation omitted).

The combined lodestar of Plaintiff's Lead Counsel is $3,149,852.25, based on total of 5,726.75 hours. Taylor Dec., Exs. D through BB. This lodestar includes time spent by counsel for plaintiffs in this Action as well as the Delaware Action. Notably, Defendants insisted on a global Settlement, and therefore it is

appropriate to include the time spent on all of the cases when considering the loadstar amount.

In addition, the average hourly rate was reasonable.  In this regard, the fee requested here is comparable to, or below, those awarded in other cases in this Circuit. *Compare Franklin Balance Sheet Inv. Fund v. Crowley*, No. 888-VCP, 2007 WL 2495018, at \*14 (Del. Ch. Aug. 30, 2007) (Order) ($4.2 million fee represented an hourly rate of $4,023 per hour); *In re NCS Healthcare S'holders Litig.*, No. 19786, 2003 WL 21384633, at \*3 (Del. Ch. May 28, 2003) ($10 million fee represented an hourly rate of approximately $3,030 per hour); *Dagron v. Perelman*,  No. 15101, Tr. at 48-51 (Del. Ch. Aug. 29, 1997) ($3,000,000 fee represented an hourly rate of approximately $3,500) (Taylor Dec. Ex. HH); *In re Digex, Inc. S'holder Litig.*, No. 18336, Tr. at 141-47 (Del. Ch. Apr. 6, 2001) (lodestar of $1.4 million awarded fee of $12.3 million, representing lodestar multiplier of 9) (Taylor Dec. Ex. II); *Louisiana Mun. Police Emps.' Ret. Sys. v. Crawford*,  No. 2635 (Del. Ch. June 8, 2007) (Order)(order approving fees of $20 million representing a lodestar multiplier of 6.5) (Taylor Dec. Ex. JJ).

## V.   **CONCLUSION**

For the foregoing reasons, Class Counsel respectfully request that the Court grant the relief requested herein.

Respectfully submitted,

CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.

Attorneys for Plaintiff

By:___/s/ *Lindsey H. Taylor*_____
        LINDSEY H. TAYLOR

Dated:  March 2, 2012

Of Counsel:

Gerald Silk
Mark Lebovitch
Brett M. Middleton
Jeremy Friedman
BERNSTEIN LITOWITZ BERGER
    & GROSSMANN LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

Jay W. Eisenhofer
Michael J. Barry
Caitlin Moyna
GRANT & EISENHOFER P.A.
123 Justison Street
Wilmington, Delaware 19801
(302) 622-7000