UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE:<br><br>MEDCO/EXPRESS SCRIPTS MERGER LITIGATION | Civil Action No.<br>11-4211(DMC)(MF) |

_____

**Professor Guhan Subramanian's Supplemental Declaration in Support of Plaintiff's Motion for an Award of Attorneys' Fees**
_____

James E. Cecchi
Lindsey H. Taylor
Donald A. Ecklund
Zachary S. Bower
CARELLA, BYRNE, CECCHI
   OLSTEIN, BRODY & AGNELLO
5 Becker Farm Road
Roseland, New Jersey 07068
(973) 994-1700

Jay W. Eisenhofer
Michael J. Barry
Caitlin Moyna
GRANT & EISENHOFER P.A.
123 Justison Street
Wilmington, Delaware 19801
(302) 622-7000

Gerald Silk
Mark Lebovitch
Brett M. Middleton
Jeremy Friedman
BERNSTEIN LITOWITZ BERGER
   & GROSSMANN LLP
1285 Avenue of the Americas
New York, NY 10019
(212) 554-1400

*Attorneys for Plaintiff*

I, Guhan Subramanian, submit this supplemental declaration in the above captioned matter and in response to the Declaration of Kevin Dages submitted in connection with Defendants' opposition to Plainitff's Motion ("Dages").  I previously submitted to the Court the Declaration of Guhan Subramanian dated March 2, 2012 ("Declaration").

1.  Mr. Dages incorrectly asserts that the range of acceptable attorneys' fees in my Declaration is between $12.54 million and $96.03 million.  Dages ¶ 7(i).  That is incorrect.  Exhibit 3 of my Declaration provides the correct range, with fee estimates ranging from $15.3 million to $36.9 million.  Thus, Mr. Dages' conclusion that the range I calculated is too broad to be of any guidance to the Court is based on a range I did not recommend, and is simply wrong.

2.  Mr. Dages further asserts that I relied exclusively on the Delaware Chancery Court's approach in *In re Compellent Technologies, Inc. Shareholder Litigation*, C.A. No. 6084, 2011 WL 6382523 (Del. Ch. Dec. 9, 2011) ("*Compellent*").  Dages ¶ 10.  That is also incorrect.  My Declaration relied on a methodology of simply summing up the various quantifiable benefits achieved by the settlement, an approach that was endorsed and applied in *Compellent* and more recently in *In re Celera Corporation Shareholder Litigation*, C.A. No. 6304, 2012 WL 1020471 (Del. Ch. March 23, 2012).

3. Mr. Dages asserts that the chance of a competing bid was "near-zero" because "no other potential buyer expressed an interest in acquiring Medco." Dages ¶ 14. This hindsight is contradicted by the fact that the Medco board identified at least two plausible counterparties, CVS Caremark and United Healthcare, but declined to contact either of them during the pre-signing phase. Corporate boards of directors generally do not consider – or disclose that they considered – potential counterparties that are not plausible. Mr. Dages' conclusion of a "near-zero" probability of a competing bidder also ignores a host of qualitative factors I reference in my Declaration, including the fact that Medco lost its United Healthcare contract. *See* Declaration ¶¶ 35-39.

4. Assuming that Mr. Dages's "near-zero" probability that a topping bidder would emerge could be quantified as 2%, this would support a fee in the range of $6.1 million to $8.3 million.[1]

5. Mr. Dages's proffered empirical evidence is based on a misunderstanding of how deal protection devices function. Mr. Dages believes that the probability that a topping bidder would emerge in response to a loosening of a particular deal protection will somehow vary depending on whether the modification of the deal protection was achieved through litigation or some other

---

[1] Mr. Dages does not challenge the expected mark-up range I used in my Declaration, from 10%-14%.

means. Dages ¶¶ 16-18. Theoretical and empirical research supports the notion that deal protection devices deter the emergence of competing bidders, and that the tempering of those devices increases the likelihood of competing bidders. Mr. Dages provides no cogent reason why it would matter to a topping bidder that the modified deal protections were achieved through litigation, nor could he, because the method used to achieve the modifications would not impact the result, namely, a lower barrier for competing bidders to enter the negotiations.

6. Even accepting *arguendo* Mr. Dages' flawed starting point for his analysis, his conclusion that "in only 1 of the 607 announced transactions since 2003 with a Transaction Value in excess of $1 billion was a reduction in termination fees followed by the emergence of a competing bidder," Dages ¶ 17, is highly misleading because *only 24 of the 607 transactions involved a reduction in termination fees*, *id.* n.37. Therefore, Mr. Dages' conclusion is clearly erroneous and should be disregarded.

7. In addition, Mr. Dages reports that a topping bidder did emerge in 1 of the 24 transactions that involved a reduction of a termination fee. Dages ¶ 17 and n.37. This equates to a 4.2% probability that a topping bidder will emerge when there is a reduction in termination fees. Applying this figure yields a range of attorneys' fees of $12.9 million - $17.5 million.

- 3 -

8. In summary, it is my opinion that the Dages Declaration not only fails to undermine the conclusions I reach in my Declaration, but in some instances, actually supports those conclusions.

By: _____
GUHAN SUBRAMANIAN

Dated: April 9, 2012